[Civ. No. 24765.   First Dist., Div. Three.   Sept. 5, 1968.]

IDACO LUMBER COMPANY, Plaintiff and Appellant, v. NORTHWESTERN SAVINGS AND LOAN ASSOCIATION, Defendant and Appellant.

Bowser, Brunn & Deal, Helzel, Leighton, Brunn & Falconer and McKnight Brunn for Plaintiff and Appellant.

Nelson, Boyd, Menary & MacDonald, Richard T. Tarrant and Thomas C. Nelson for Defendant and Appellant.

BROWN (H. C.), J.—This is an appeal by Northwestern Savings and Loan Association (Northwestern), the construction project lender, from a judgment awarding Idaco Lumber Company (Idaco) the full amount specified in a stop notice claim for the value of materials furnished under a building construction contract. Idaco also appeals, claiming a greater amount of interest and that the allowance for costs for bond premium should be increased.

Northwestern contends that the payments to the general contractor W. F. Backes Construction Co., Inc. (Backes), from the Jebb Development Company (Jebb) loan account were rendered insufficient to pay all claimants in full and that each claimant, including Idaco, was entitled only to a pro rata share from the balance in the account. The trial court awarded Idaco payment in full because Idaco was the only claimant that established a lien on the loan fund by perfecting its stop notice claim pursuant to the provisions of Code of Civil Procedure section 1190.1, et seq.

The Facts: On April 2, 1963, Northwestern loaned Jebb $135,000 and received a note secured by a deed of trust. The loan conformed to the statutory requirements for construction

loans made on the basis of an appraisal of the unimproved land and the plans and specifications for the proposed building. (See Fin. Code, §§ 1227, 7153, 7153.4. Loans by lending institutions are limited to a percentage of the appraised value of the property.)

The purpose of the loan was to enable the borrower to construct on its real property improvements to be known as Larkspur Plaza. The loan agreement provided that the funds were to be held by Northwestern in an account labeled "Jebb Development, Inc.," loan and were to be paid to the general contractor Backes in ten installments as the work progressed. By February 1964, Northwestern had paid to Backes $97,422.69, leaving $37,577.31 in the Jebb loan account. This balance was insufficient to pay subcontractors the amounts due them which were in excess of $60,000.

There was due Idaco a sum in excess of $10,000. Because of this delinquency, Idaco on February 13, 1964, pursuant to section 1190.1, subdivision (h) of the Code of Civil Procedure,[1] served a verified bonded stop notice on Northwestern. The notice specified the type and value of materials furnished, that payment was due and to withhold in the fund sufficient to pay the claim. Northwestern thereafter made no further payments to Backes, the building contractor, or Jebb, and work on the job was discontinued. Section 1190.1, subdivision (c) states in part as follows: *"Upon such notice being given it shall be the duty of the person to whom such notice is given to . . . withhold from his contractor . . . sufficient money . . . due or that may become due to such contractor to answer such claim . . ."* (Italics added.)

By May 4, 1964, 19 stop notices in the total sum of $62,846.14 had been delivered to Northwestern on behalf of the subcontractors and materialmen. At this time the balance due Idaco was $10,099. On May 7, 1964, Northwestern transferred the entire balance of $37,577.31 out of the Jebb account into its general fund and applied that amount to the reduction of Jebb's indebtedness to Northwestern. Thereafter Northwestern paid the $37,577.31 on a pro rata basis to all of the stop notice claimants except Idaco which demanded payment in full with interest. Northwestern made the pro rata payments to the other claimants prior to the expiration of the statutory period for stop notice claimants to file suit. In addi-

---

[1] All statutory references are to the Code of Civil Procedure.

tion to the pro rata payments, Northwestern voluntarily paid from its general funds to the stop notice claimants, except Idaco, and to three mechanics lien claimants who had not filed stop notices, the balance of their claims so that each claimant except Idaco received 100 percent of its stop notice claim or lien claim. The record is silent as to Northwestern's reason for not including Idaco when it voluntarily made payments in full to other claimants.

On July 1, 1964, Idaco filed its action herein for the balance of $10,000 due on the Larkspur Plaza project, plus interest at 7 percent per annum from January 15, 1964, and in a second cause of action for $393.05 principal, due on another project known as the Sonoma Village project, plus interest at 7 percent from October 29, 1963. In the Sonoma Village project Idaco also had been tendered a pro rata payment but rejected it claiming the full amount due plus interest.

Except for the dollar amounts and the dates of delivery, the facts relating to the Sonoma Village project in the second cause of action are similar to those relating to Larkspur Plaza. Idaco and Northwestern stipulated that the court's determination as to Larkspur Plaza would be controlling with respect to Sonoma Village.

At the trial Idaco stipulated that all stop notice claimants had performed services or furnished materials and that those services and materials were of the reasonable value claimed. Idaco did not stipulate that all claimants and mechanics lienors could be paid from the loan fund on a pro rata basis without perfecting their claims. Nor was it stipulated that Northwestern's pro rata distribution was made in conformity to statutory requirements. This stipulation did not affect Idaco's claim as the issue before the court was not whether the services performed and the materials furnished by the various claimants represented true value but whether those claimants were entitled to participate in a pro rata distribution of the fund which would proportionately reduce the amount to be paid to Idaco which had perfected its claim.

The court found that Idaco's stop notice claim was verified, bonded, served, and in all other respects complied with the requirements of section 1190.1, subdivision (h); that Idaco brought its action within the 90-day period provided by section 1197.1, subdivision (a), and that Idaco gave Northwestern registered-mail notice of the action within five days after commencing its action as required by section 1197.1, subdivision (b). Idaco's bond in support of its stop notice claim was

in the sum of $44,699.20 (the original amount of all of its claims), more than four times the aggregate total amount claimed on the two projects covered by Idaco's complaint. (Code of Civil Procedure section 1190.1, subdivision (h) requires that the bond be in an amount equal to 125 percent of the claim. The required bond secured payment of costs and damages in the event the owner or general contractor be awarded judgment.)

The trial court concluded that Idaco was entitled to the full amount of the principal and interest on its stop notice claims. Further, the court adjudged Northwestern personally liable to Idaco jointly and severally with Jebb and Backes for the balance of $10,000 with respect to the Larkspur Plaza project, and jointly and severally with Backes for a balance of $393.05 on the Sonoma Village project, but that Northwestern's liability to Idaco for interest on said principal amounts at the legal rate of 7 percent per annum did not commence to accrue until August 1, 1964.

After judgment, on a motion by Northwestern to tax costs, the court held that Idaco should be allowed $199.20 per annum as premium on the stop notice bond.

Northwestern appeals from the judgment and from the separate order taxing costs made and entered on March 23, 1967. Idaco appeals from the portion of the judgment that adjudges the dates at which interest commenced to accrue.

Northwestern contends that as the balance in the Jebb account was insufficient to pay all claimants in full, it could distribute the funds on a pro rata basis to the various claimants; that there was no necessity for the various claimants to file suit as now Idaco concedes the claim for services and materials to be correct; and that if suit had been filed by each claimant, the total amount that Idaco could recover was its pro rata share. Northwestern cites section 1190.1, subdivision (d), which provides: "(d) In the event the moneys so withheld or required to be withheld shall be insufficient to pay in full the *valid demands* of all persons by whom such notices were given, the same shall be distributed among such persons in the same ratio that their respective claims bear to the aggregate of such valid demands. Such pro-rata distribution of said moneys shall be among the persons entitled to share therein, without regard to the order of priority in which their respective notices may have been given or their respective actions, *if any,* commenced." (Italics added.)

Northwestern argues that the "if any" in the last line of section 1190.1, subdivision (d) makes it permissive to make payments to claimants without the necessity of suit, and that it could have invited long and drawn out litigation which ultimately would accomplish no more than was accomplished by the voluntary payments. By such voluntary payments all of the claimants received all of the money to which they were entitled several years sooner. And, Northwestern was able to finish the construction of the improvements with its own funds, thus relieving the claimants and itself of long, drawn out litigation, expenses and attorney's fees.

The importance of making prompt payments to subcontractors, mechanics and materialmen is recognized. It is also important to the lending institution to have all claims paid when due in order that construction may be completed so that the potential economic return from the building under construction may be realized. But it is contrary to the express provisions of section 1190.1 to repose in the lending institution the power to adjudicate claims involving decisions on questions of costs, interest, attorneys' fees and value of services and materials. Here some of the claims were unverified, others were not bonded and included with stop notice claimants were three mechanic's lien claimants who had not filed stop notice claims.

The argument of Northwestern further ignores the fact that Northwestern made payments out of funds that it did not own and which had been liened by Idaco's stop notice claim. Northwestern had loaned the money to Jebb. Its security was the first deed of trust on Larkspur Plaza project. ■ Jebb was the owner of the fund and was entitled to it after the payment of all claims or in the event of the failure of the stop notice claimants to prove their claims by court adjudication. (Code Civ. Proc., § 1197.1.) For this reason the owner, Jebb, is a necessary party to the action.

■ Section 1190.1, subdivision (d) and the words "if any" relate to stop notice claimants who have perfected their claims, and it must be interpreted with relation to other pertinent sections hereafter referred to.

■ Here Northwestern transferred the balance in the Jebb loan account to its general fund, but it is settled that the construction lender cannot defeat the rights of a stop notice claimant by a transfer to itself, as here, or by overpayment of the fund. (See *Calhoun* v. *Huntington Park First Sav. & Loan Assn.*, 186 Cal.App.2d 451 [9 Cal.Rptr. 479]; *A-1 Door*

& *Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.,* 61 Cal.2d 728, 734 [40 Cal.Rptr. 85, 394 P.2d 829] ; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn.,* 221 Cal.App.2d 705, 710 [34 Cal.Rptr. 644].)

Code of Civil Procedure section 1190.1, subdivision (h) provides: ''. . . No assignment by the owner or contractor of construction loan funds, whether made before a verified claim is filed, or after such claim is filed shall be held to take priority over claims filed under this subsection (h) and such assignment shall have no binding force insofar as the rights of claimants who file claims hereunder are concerned.'' This language is unequivocal and applies to those situations, as here, wherein the contractor assigns the loan fund back to the lending institution for the purpose of making progressive installment disbursements, and it also applies to assignments subsequent to receipt of the stop notice claim.

Northwestern's contention that it absolved itself from liability by making a pro rata payment to all claimants overlooks the provisions of section 1197.1 which make it mandatory that the stop notice claims be perfected before the claimant may be paid and require an action to be filed to establish the claim. Section 1197.1, subdivision (a) provides in part: ''. . . if such proceedings have not been commenced, such notice shall cease to be effective and the moneys . . . withheld shall be paid . . . to the contractor or other person to whom they are due.''

*In A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 736, the court states: ''The claimants' right to payment, however, arises not simply upon their giving notice of their claims, but upon compliance with section 1197.1 of the Code of Civil Procedure.'' Further, the court held that the stop notice claim creates a lien on the entire fund remaining in the possession of the construction lender and not merely on the installments due at the time of receipt of the stop notice. Also, before a stop notice claimant is entitled to payment from the fund, the claim must be perfected and legal proceedings must be instituted.

The court further points to the provisions of the statute for either independent suits by the claimants which may be consolidated in one action or for the interpleading of the various claimants. (See Code Civ. Proc., § 1197.1, subdivisions (b), (c), (d).) Northwestern here assumed the authority to make the pro rata payments and did not require the filing of suits

which could have been joined in one action; nor did Northwestern interplead the claimants in Idaco's action, the statutory procedure for more speedily adjudicating claims. Northwestern's arguments to eliminate the delays and expenses attendant with the legal proceedings required by the statute are subjects for legislative improvement rather than judicial interpretation.

The court in *A-1 Door, supra,* also distinguishes between an unperfected claimant and the stop notice claimant who has complied with the statute by filing suit and answers the contention that mechanic's lien claimants who have not filed stop notice claims should share in the fund. The court stated at page 732 as follows: ''We agree with defendant that the evidence does not support the finding that the mechanic's lien claimants were entitled to equitable liens on the loan funds. An equitable lien may be imposed on a construction-loan fund only if it is established that the borrower or lender induced the supplier of labor or materials to rely on the fund for payment. . . .[2]

''Invoking *Hayward Lbr. & Inv. Co.* v. *Coast etc. Assn.,* 47 Cal.App.2d 211 [117 P.2d 682], the mechanic's lien claimants contend that they established their right to an equitable lien merely by filing mechanic's lien claims. That case did not so decide. The fundholder there conceded the claimants' right to the fund, and the only issue litigated was whether it was necessary to file suit to perfect the claims.

''The mechanic's lien claimants contend that the trial court erred in upholding the claims of two stop-notice claimants because they did not file mechanic's lien claims. The right to recover on a stop-notice claim, however, 'does not depend upon the establishment of a lien.' (*Diamond Match Co.* v. *Silberstein,* 165 Cal. 282, 288 [131 P. 874].) The remedies are independent and cumulative. (*Id.* at pp. 288-289; *Calhoun* v. *Huntington Park First Sav. & Loan Assn.,* 186 Cal.App.2d 451, 459 [9 Cal.Rptr. 479], and cases cited.)'' The same reasoning applies to the stop notice claimants who did not perfect their claims by filing suit. (See *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & Loan Assn., supra,* 221 Cal.App.2d 705, 711.)

---

[2]Although not applicable here, see Code of Civil Procedure, section 1190.1, subdivision (n) re: abolition of equitable lien; Code of Civil Procedure, section 1193, subdivisions (a), (c), (d) re: requirement of notice 20 days after furnishing labor or materials; Witkin, Summary of Cal. Law (1967 Supp.) § 9A, pp. 270-271.

■ The provisions for filing of stop notice claims by those who perform services or furnish material to a building is an additional remedy to mechanics and materialmen. It reaches the construction fund directly while the mechanics' and materialmen's lien is against the property and could be extinguished by foreclosure of the construction lender's first deed of trust which has priority.[3] (See *Fickling* v. *Jackman,* 203 Cal. 657 [265 P. 810]; Ilyin, *Stop Notice!—Construction Loan Officer's Nightmare* (1964-1965) 16 Hastings L.J., 187; *California Mechanics' Liens,* 51 Cal.L.Rev. 331, 343; Goulden and Dent, *More on Mechanics Liens, Stop Notices, and the Like* (1966) 54 Cal.L.Rev. 179.)

■ It is concluded that Idaco by its stop notice claim effectively created a lien on the Jebb loan account at Northwestern, and that Northwestern could not invalidate Idaco's claim by transferring the Jebb account to its own general fund and thereafter making pro rata payments to all other creditors (here to creditors who had not perfected their stop notice claims and to mechanics lienors). The Jebb account being subject to Idaco's perfected claim, Northwestern was required by statute to withhold an amount sufficient to pay Idaco's claim. Having failed to do so, Northwestern is personally liable for the full amount plus interest.[4]

The parties having stipulated that a judgment relative to Larkspur Plaza project would also be applicable to the Sonoma Village project, it is likewise concluded that Idaco is entitled to payment in full of its claim against Northwestern in the sum of $393.05 plus interest.

■ Contrary to Northwestern's contention, the trial court properly made an allowance to Idaco for the amount of the bond premium as a court cost. This allowance (Code Civ. Proc., § 1190.1, subdivision (h) provides: ". . . whereupon the person so given such notice . . . may withhold funds to answer such claims . . . but shall be under no obligation to do so unless a bond is furnished . . ." The section then provides that the bond shall be in an amount equal to 125 percent

---

[3] As a general rule the deed of trust held by a lender or other party will have priority over mechanics' liens if the deed of trust held by the lender was recorded prior to the time the work of improvement first commenced. (See *California Mechanics' Liens,* 51 Cal.L.Rev. 331, 348-351.)

[4] (See *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.,* 61 Cal.2d 728, 733 [40 Cal.Rptr. 85, 394 P.2d 829], re use of terms of equitable garnishment, equitable assignment, equitable lien, stop notice claims.)

of the claim. Thus, when the claim is accompanied by the bond, the lending institution must withhold sufficient money with which to answer such claim. Section 1190.1, subdivision (m) also provides a procedure by which the lending institution may object to sureties other than corporate sureties. The lending institution therefore has the option under this section to reject unbonded claims. In order for Idaco to perfect its stop notice claims, the premium for a surety bond was a necessary cost, and it was not error for the trial court to so allow it.

Idaco contends on its appeal that the trial court erred in allowing $199.20 per year for three years as the bond premium instead of $477 per year for three years. An order on motion to retax costs made after final judgment is appealable as a special order and is not reversible on an appeal from the judgment. (*Smallpage* v. *Turlock Irrigation Dist.*, 26 Cal. App.2d 538, 541 [79 P.2d 752].) Idaco, having failed to appeal from the order retaxing costs, is now precluded from raising the issue.

Idaco also contends that it is entitled to interest from Northwestern from January 15, 1964, on the Larkspur Plaza project and from October 29, 1963, on the Sonoma Village project rather than from August 1, 1964, as adjudged by the trial court. This issue was resolved in *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.*, *supra*, 61 Cal.2d 728, 737, when the court stated: " . . .'The "equitable garnishment" effected through stop notice proceedings, like the mechanic's lien, "is as extensive as the claim which it is intended to protect." [Citations.] To the extent that construction loan funds are available, therefore, the fund-holder must pay whatever the owners owe the stop-notice claimants.' "

In *Calhoun* v. *Huntington Park First Sav. & Loan Assn.*, *supra*, 186 Cal.App.2d 451, 462, the court said: "Where the amount payable under a contract is fixed thereby, interest thereon is recoverable in an action against the promissor from the date the obligation becomes due."

Here Idaco's stop notice claim was filed and perfected at a time when the loan fund was more than sufficient to pay the same. Interest was therefore a proper charge against the loan fund from the time the owner-borrower owed the interest to claimant, i.e., January 15, 1964, on the Larkspur Plaza project and October 29, 1963, on the Sonoma Village project.

(See Ilyin, *Stop Notice!—Construction Loan Officer's Nightmare,* 16 Hastings L.J. 196.)

The trial court is directed to modify the judgment to provide for an award of interest at 7 percent per annum from January 15, 1964, to Idaco on the amount of its claim on the Larkspur Plaza project and to award interest at 7 percent per annum from October 29, 1963, on Idaco's claim on the Sonoma Village project.

The judgment as so modified and the order taxing costs are affirmed. Costs are to be borne by appellant Northwestern.

Draper, P. J., and Salsman, J., concurred.

The petition of the defendant and appellant for a hearing by the Supreme Court was denied October 30, 1968.