[S.F. No. 23225. Aug. 31, 1976.]

CONNOLLY DEVELOPMENT, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF MERCED COUNTY, Respondent;
DIAMOND INTERNATIONAL CORPORATION,
Real Party in Interest.

804

## COUNSEL

Orr, Wendel & Lawlor and Eugene K. Lawlor for Petitioners.

Miller, Starr & Regalia, Harry D. Miller and Cecily A. Drucker as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Norman S. Stimmel and Russell H. McLain for Real Party in Interest.

Munns, Kofford, Hoffman, Hunt & Throckmorton, Gordon Hunt, Ralph W. Hoffman, Galisky & Rubino, Samuel N. Rubino, Keller & Holt, Edgar C. Keller, Cox, Castle, Nicholson & Weekes, George M. Cox, Arthur O. Spaulding, Jr., W. Stephen Wilson, McCarthy, Johnson & Miller, P. H. McCarthy, James E. Miller, Brundage, Beeson, Reich, Pappy & Hackler and Roger Frommer as Amici Curiae on behalf of Real Party in Interest.

## OPINION

**TOBRINER, J.**—This petition for mandate and prohibition challenges the constitutionality of California's mechanics' lien and stop notice laws on the ground that these laws permit the recording of a mechanics' lien and the filing of a stop notice without a prior hearing and without adequate provision for a prompt post-lien hearing. Although we recognize that the imposition of these liens constitutes the "taking" of a significant property interest by means of state action, we shall point out that the "taking" permitted by the mechanics' lien and stop notice laws conforms to the requirements of procedural due process.

Following the reasoning of recent United States Supreme Court decisions, we must, in resolving the procedural due process issue in question here, carefully define and analyze the competing interests of the "debtor," the "creditor" and the public generally, in the specific "taking"

encompassed by the statutory provisions; we must determine whether the procedure afforded by the legislative provisions reasonably accommodates the competing interests involved.

As to the interest of the owner whose property is subject to a mechanics' lien, we shall explain that he suffers only a minor deprivation by reason of the lien since he retains possession and use of the land; the owner whose account is subject to a stop notice suffers only the encumbrance of the very funds he has previously allocated for the exclusive purpose of paying construction costs. Moreover, the owner enjoys a variety of measures by which he can protect himself against the impact of such a lien, most notably the requirement that the mechanic must file a preliminary notice before filing or recording his lien, thus affording the owner opportunity to take legal steps against any imposition of an improper lien.

As to the worker whose labor has gone into the property, we point out that he would suffer a major deprivation by the abolition of the lien. Without recourse to prevent the owner from the disposition of the property, or to bar the dissipation of loan funds allocated to the payment of construction costs, the worker would be left with only an unsecured and potentially uncollectible claim for compensation for labor that has enhanced the value of the property itself.

We explain that the decision of the United States Supreme Court in *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.* (1975) 419 U.S. 601 [42 L.Ed.2d 751, 95 S.Ct. 719], does not control the instant case; that decision is but one of an array of recent decisions holding that identification of the dictates of procedural due process depends upon an accommodation of the governmental and private interests involved. Although *North Georgia* struck down a Georgia garnishment statute which provided insufficient protection for the interest of the debtor in the seized property, we conclude that because of the unique characteristics of the mechanics' lien and stop notice laws as to both laborer and property owner, and the presence of safeguards in the California laws absent from the Georgia garnishment law, a reconciliation and accommodation of the competing interests in the present case impels the validation of the statutory provisions.

In support of that conclusion we point out that the incursion of the interests of the owner is slight; on the other hand, the loss of the protection of the statutes to the worker would be great. The California

Constitution explicitly recognizes the importance of the protection of the claims of the mechanic and materialmen; no other "creditor remedy" in this state enjoys such a constitutionally enshrined status. Thus, the mechanics' lien and stop notice law comply with the requirements of procedural due process.

1. *Derived from the California Constitution, the mechanics' lien is elaborated in detailed statutory provisions; similar provisions set forth the stop notice.*

The California mechanics' lien derives from article XX, section 15, of the California Constitution and chapters 1 and 2 of title 15, part 4, division 3 of the Civil Code. Under this statutory scheme, materialmen, contractors, subcontractors, and other persons listed in Civil Code section 3110[1] who furnish labor or materials on a work of improvement are entitled to file a mechanics' lien on the property where the improvement is located. To secure a lien, a materialman must file a preliminary notice with the owner, the general contractor and the construction lender within 20 days after furnishing the materials (§§ 3097, 3114), and thereafter record his claim of lien within 90 days of completion of the improvement (§ 3116). If a notice of completion (see § 3093) or notice of cessation of work (see § 3092) has been recorded, the claimant must record his claim of lien within 30 days of such notice. (§ 3116.)

Once recorded, the mechanics' lien constitutes a direct lien (§ 3123) on the improvement and the real property to the extent of the interests of the owner or the person who caused the improvement to be constructed (§§ 3128, 3129). The lien is subordinate to recorded encumbrances antedating the commencement of the work of improvement (*Walker* v. *Lytton Sav. & Loan Assn.* (1970) 2 Cal.3d 152, 159 [84 Cal.Rptr. 521, 465 P.2d 497]; see § 3134), but takes priority over all subsequent encumbrances (§ 3134). By purchase and recordation of a payment bond, however, the owner or the holder of a subordinate encumbrance may secure priority over mechanics' liens. (See §§ 3138, 3139.) The owner, lender, contractor or subcontractor may also secure the release of any mechanics' lien by purchasing and recording a bond in a sum equal to one and one-half times the amount of the claim. (§ 3143.) The lien terminates unless the materialman initiates a suit to foreclose the lien within 90 days after recording of the claim of lien. (§ 3144.)

---

[1]Unless another code is cited expressly, all citations to code sections in this opinion refer to the Civil Code.

Sections 3156-3172, which provide for the use of stop notices in connection with private construction, grant subcontractors and materialmen an additional remedy, independent of but cumulative to any right to assert a mechanics' lien. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.* (1964) 61 Cal.2d 728, 732 [40 Cal.Rptr. 85, 394 P.2d 829].) After giving 20 days preliminary notice (§ 3160), the materialman may serve a stop notice upon the owner or the construction lender (§§ 3158, 3159). Upon receipt of such notice, the owner must withhold from the general contractor sufficient money to pay the stop notice claimant. (§ 3161.)

Unlike the owner, the lender may disregard an unbonded stop notice (*Miller* v. *Mountain View Sav. & L. Assn.* (1965) 238 Cal.App.2d 644, 661 [48 Cal.Rptr. 278]), but upon receipt of a notice accompanied by a bond equal to one and one-fourth times the amount of claims (§ 3083) the lender must withhold from the unexpended balance of the loan fund a sum sufficient to pay the claim. (§ 3162.) Failure of the owner or lender to withhold money as required by the notice may render him personally liable to the claimant, notwithstanding the absence of privity of contract.

Although the mechanics' lien may provide adequate protection for materialmen when the owner finances the improvement from his own funds, such liens can be wiped out by the foreclosure of a lender's trust deed. The value of the stop notice lies in the fact that its lien attaches to the unexpended balance of the loan, not to the land, and thus survives foreclosure of the trust deed.[2] The stop notice claimant also acquires a right to the fund superior to that of any assignee from the owner or contractor. (§ 3166), and superior to the lender's contractual right to employ unexpended funds to complete the work of improvement (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 733-735; *Idaco Lumber Co.* v. *Northwestern S. & L. Assn.* (1968) 265 Cal.App.2d 490, 496-497 [71 Cal.Rptr. 422]; *Rossman Mill & Lbr. Co.* v. *Fullerton S. & L. Assn.* (1963) 221 Cal.App.2d 705, 710 [34 Cal.Rptr. 644].)

The owner and lender can protect themselves against stop notices by securing and recording a payment bond from the general contractor. (See §§ 3161, 3162, 3235.) The owner, lender, contractor or subcontractor may also secure the release of any stop notice by filing a bond equal to

---

[2]See Note, *California's Private Stop Notice Law: Due Process Requirements* (1974) 25 Hastings L.J. 1043-1044, 1049-1050.

one and one-fourth times the amount claimed in the notice. (§ 3171; see *Frank Curran Lbr. Co.* v. *Eleven Co.* (1969) 271 Cal.App.2d 175, 185 [76 Cal.Rptr. 753].) The obligation of the owner or lender to withhold funds terminates unless the claimant files suit to enforce the stop notice within 90 days after expiration of the period for recording claims of lien. (§ 3172.)

Of significance in view of the constitutional issues presented here is that no state official scrutinizes the basis for an asserted mechanics' lien or stop notice claim prior to the imposition of the lien. The materialman must file his mechanics' lien with the county recorder, but that functionary is not authorized to adjudicate the probable validity of the lien; the stop notice is delivered directly to the owner or lender without intervening official action. Although statutes authorizing stop notices in connection with public works establish a means for speedy adjudication of any dispute (see §§ 3197-3204), no similar provisions appear in the statutory regulations for mechanics' liens or stop notices in private construction.

In the present case, Connolly Development, Inc. (hereafter Connolly), the owner and developer of a shopping center in the City of Los Banos, entered into a construction contract with Ralph E. Carlsen Construction Co. (Carlsen). Connolly arranged a construction loan with Union Bank to finance the improvement. At Carlsen's request, Diamond International Corporation (Diamond) furnished materials for the shopping center. On February 15, 1973, Diamond, after complying with the preliminary notice requirements, recorded a mechanics' lien for $6,727.84. On February 22, Diamond filed a bonded stop notice in the same amount with the bank.

Thereafter Diamond filed a timely complaint to foreclose the mechanics' lien and enforce the stop notice. Connolly and the Union Bank demurred on the ground that the mechanics' lien and stop notice violated procedural due process requirements; the court overruled the demurrer. Connolly and the bank then petitioned the Court of Appeal for writs of mandate and prohibition, requesting that the superior court be directed to dismiss the complaint or be restrained from proceeding further in the action. Deeming the matter one of statewide public importance (see *Mooney* v. *Pickett* (1971) 4 Cal.3d 669, 674-675 [94 Cal.Rptr. 279, 483 P.2d 1231]) the Court of Appeal issued an alternative writ. The cause comes here upon petition for hearing following the decision of the Court of Appeal.

By recording a mechanics' lien, Diamond obtained a lien upon Connolly's land; by filing the stop notice, it acquired a lien upon a fund lent by the Union Bank to Connolly and retained in the bank's hands for payment of construction expenses. Connolly and the bank assert that the imposition of such liens constitutes a taking of their property without due process of law. Resolution of this controversy requires consideration of three issues: (1) Does the recording of a mechanics' lien or the filing of a stop notice constitute a "taking" of a property interest? (2) Is this "taking" a form of "state action" and thus subject to the strictures of the Fourteenth Amendment? (3) Is the manner of the taking a denial of the owner's or lender's right to procedural due process? We shall discuss these issues in the order stated.

2. *Both the recording of a mechanics' lien and the filing of a stop notice constitute a "taking" of the landowner's property interest.*

A "taking" of property under the Fourteenth Amendment encompasses any significant deprivation of a property interest (see *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536, 552 [96 Cal.Rptr. 709, 488 P.2d 13]) including even temporary deprivations of the use of property (*Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448, 455 [121 Cal.Rptr. 585, 535 P.2d 713]; *Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 666 [105 Cal.Rptr. 785, 504 P.2d 1249]). This definition impels our conclusion that the recording of a mechanics' lien or the filing of a stop notice constitutes a "taking" of property in the constitutional sense.

Looking first at the mechanics' lien, we note that the claimant acquires a "direct lien" (§ 3123) superior to the rights of the owner or of any subsequent purchaser or encumbrancer. No one questions that the imposition of such a lien deprives the owner of a property interest; the dispute turns on whether this is a *significant* deprivation.

Pending trial of the suit to foreclose the lien, the landowner retains the possession, use, and enjoyment of his property.[3] Subject to the lien, he may lawfully sell or encumber the property. In view of the owner's right to use and dispose of the realty, some courts have considered the deprivation of property occasioned by the recording of a mechanics' lien

[3]See *Spielman-Fond, Inc.* v. *Hanson's Inc.* (D.Ariz. 1973) 379 F.Supp. 997, 999; *Cook* v. *Carlson* (D.S.D. 1973) 364 F.Supp. 24, 27; Clark & Landers, *Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution* (1973) 59 Va.L.Rev. 355, 402-403; cf. *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, 544, footnote 4 (attachment of real property); *Black Watch Farms, Inc.* v. *Dick* (D.Conn. 1971) 323 F.Supp. 100, 102 (same).

as de minimis, and hence unworthy of constitutional protection. (*Spielman-Fond, Inc.* v. *Hanson's, Inc., supra,* 379 F.Supp. 997, 999; *Cook* v. *Carlson, supra,* 364 F.Supp. 24, 28; see *Tucker Door & Trim Corp.* v. *Fifteenth Street Co.* (1975) 235 Ga. 727 [221 S.E.2d 433]; Clark & Landers, *Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution* (1973) 59 Va.L.Rev. 355, 402-403.)[4]

But although the imposition of a mechanics' lien does not deprive the owner of the interim use of his property, it may severely hamper his ability to sell or encumber that property.[5] Subsequent purchasers whose title will be subject to the lien may be unwilling to purchase a lawsuit with the land; lenders may refuse a loan on property subject to lien claims; the owner may in some cases be forced to pay a possibly invalid lien in order to clear title to his property in time for a pending transaction to be consummated.

A deprivation need not reach the magnitude of a physical seizure of property in order to fall within the compass of the due process clause. In recent decisions, the United States Supreme Court and this court have extended the protections of procedural due process to such minor deprivations as a 10-day suspension from school (*Goss* v. *Lopez* (1975) 419 U.S. 565 [42 L.Ed.2d 725, 95 S.Ct. 729]) and the requirement for a bond in appealing a small claims judgment (*Brooks* v. *Small Claims Court, supra,* 8 Cal.3d 661). The owner whose property has been subjected to a mechanics' lien has suffered at least as serious a deprivation as did the plaintiffs in *Goss* and *Brooks,* and thus cannot be denied the protection of the due process clause. (See *Barry Properties, Inc.* v. *Fick Bros. Roofing Co.* (1976) 277 Md. 15 [353 A.2d 222, 228]; *Roundhouse Constr. Corp.* v. *Telesco Masons Supplies Co.* (1975) 168 Conn. 371 [362 A.2d 778, 784;] Case Comment, *The Constitutional Validity of Mechanics' Liens under the Due Process Clause—A Reexamination after Mitchell and North Georgia* (1975) 55 B.U.L.Rev. 263, 273-276 (hereafter cited as "Case Comment").)

---

[4]Cf. *Black Watch Farms, Inc.* v. *Dick, supra,* 323 F.Supp. 100, 102 (attachment of real property); *Empfield* v. *Superior Court,* 33 Cal.App.3d 105, 108 [108 Cal.Rptr. 375] (lis pendens); Case Note, *Lis Pendens & Procedural Due Process* (1974) 1 Pepperdine L. Rev. 433, 438.

[5]Comment, *Sniadach, Overmeyer and Fuentes: Problems for the Mechanics' Lien and Protection for Real Property Developers,* 1973 L. & Soc. Order 497, 503, 505; see *Borchers Bros.* v. *Buckeye Incubator Co.* (1963) 59 Cal.2d 234, 239 [28 Cal.Rptr. 697, 379 P.2d 1]; *Frank Curran Lbr. Co.* v. *Eleven Co., supra,* 271 Cal.App.2d 175, 183-184; cf. *Gunter* v. *Merchants Warren National Bank* (D.Me. 1973) 360 F.Supp. 1085, 1090 (attachment on real property).

■ Turning to the stop notice, we see that unlike the mechanics' lien claimant, the stop notice claimant does not acquire a lien upon tangible property, but attaches an obligation whereby the lender agrees to provide credit to the owner. The filing of a stop notice is thus a form of garnishment,[6] a form of seizure that *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, 552 held a "taking" of property.

The deprivation of property occasioned by the filing of the stop notice is not de minimis. Pointing out that the credit thus garnished is earmarked for the purpose of paying construction costs, Diamond argues that constitutional protection is limited to credit available to pay for the necessities of life. But the Supreme Court has clearly rejected the view that the due process clause protects only funds available for necessities; credit employed for commercial venture also enjoys constitutional protection. (See *North Georgia Finishing, Inc.* v. *Di-Chem, Inc., supra,* 419 U.S. 601, 608 [42 L.Ed.2d 751, 758].) When a stop notice is filed, the lender, threatened with personal liability if it disregards the notice, may divert credit needed to pay for future construction to comply with the stop notice claim.[7] Thereby denied the money on which he relied to complete the project, the owner may be forced into default on the loan, and consequently lose his property.[8]

We conclude that the filing of a stop notice, as well as the recording of a mechanics' lien, deprives the landowner of a significant property

---

[6]See section 3083; *Korherr* v. *Bumb* (9th Cir. 1958) 262 F.2d 157; *Systems Inv. Corp.* v. *National Auto. & Cas. Ins. Co.* (1972) 25 Cal.App.3d 1057, 1061 [102 Cal.Rptr. 378]; *Fredericksen* v. *Harney* (1962) 199 Cal.App.2d 189, 193 [18 Cal.Rptr. 562] and cases there cited.

[7]*Diamond* suggests that a lender, in its own self-interest, will sometimes choose to disregard the stop notice and assume the risk of personal liability. (See, e.g., *Systems Inv. Corp.* v. *National Auto. & Cas. Co., supra,* 25 Cal.App.3d 1057, 1059; *Idaco Lumber Co.* v. *Northwestern S. & L. Assn., supra,* 265 Cal.App.2d 490, 493; *H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn.* (1964) 226 Cal.App.2d 24, 25-26 [37 Cal.Rptr. 775]; *Rossman Mill & Lbr. Co.* v. *Fullerton S. & L. Assn., supra,* 221 Cal.App.2d 705; *Calhoun* v. *Huntington Park First Sav. & Loan Assn.* (1960) 186 Cal.App.2d 451, 458 [9 Cal.Rptr. 479].) But there is no way for the owner to compel the lender to disburse funds in violation of the stop notice.

[8]For analysis of the problems which the filing of a stop notice can cause the owner and construction lender, see Ilyin, *Stop Notice!—Construction Loan Officer's Nightmare* (1964) 16 Hastings L.J. 187, 191-194; Miller, *Validity of the Stop Notice As a Summary Remedy* (1973) 48 State Bar J. 45, 106; Note, *California's Private Stop Notice Law: Due Process Requirements* (1974) 25 Hastings L.J. 1043, 1052-1054.

interest, and thus constitutes a "taking" within the meaning of the federal and state due process clauses.[9]

3. *The imposition of a lien on the owner's property by the recording of a mechanics' lien or the filing of a stop notice constitutes "state action."*

Since "private action, however hurtful, is not unconstitutional" (*Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352, 358 [113 Cal.Rptr. 449, 521 P.2d 441]; see *Shelley* v. *Kraemer* (1948) 334 U.S. 1, 13 [92 L.Ed. 1161, 1180, 68 S.Ct. 836, 3 A.L.R.2d 441]), we must next inquire whether the State of California is so significantly involved in the imposition of these liens that we may characterize that imposition as "state action."[10] (*Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d 352, 359; see *Adams* v. *Southern California First National Bank* (9th Cir. 1973) 492 F.2d 324, 330; *Kipp* v. *Cozens* (1974) 40 Cal.App.3d 709, 716 [115 Cal.Rptr. 423]; cf. *Moose Lodge No. 107* v. *Irvis* (1972) 407 U.S. 163, 173 [32 L.Ed.2d 627, 637, 92 S.Ct. 1965].)[11]

In *Adams* v. *Department of Motor Vehicles* (1974) 11 Cal.3d 146 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803] we held that the action of a private automobile repairman in asserting a possessory garageman's lien, and selling the customer's vehicle pursuant to that lien, constituted state action on the ground that "the lien is expressly provided for by statute, ... and a state agency oversees the sale and records the transfer of title." (11 Cal.3d at p. 153.) Similar indicia of significant state involvement call

---

[9]We conclude, however, that neither the recording of a mechanics' lien nor the filing of a stop notice constitutes a taking of the *lender's* property. The mechanics' lien attaches to the landowner's realty; the stop notice garnishes the landowner's credit; neither encumber property of the lender. Although the filing of a stop notice imposes upon the lender a liability to the claimant which the lender has not contractually agreed to assume, the imposition of that liability does not constitute a "taking" of property in the constitutional sense. (See *California Auto. Assn.* v. *Maloney* (1951) 341 U.S. 105, 110-111 [95 L.Ed. 788, 792-793, 71 S.Ct. 601].)

[10]Obviously all statutes, including the mechanics' lien and stop notice laws, constitute state action of a sort, for the Legislature and not private persons enact legislation. (See generally Horowitz & Karst, *The California Supreme Court and State Action Under the Fourteenth Amendment: The Leader Beclouds the Issue* (1974) 21 U.C.L.A.L.Rev. 1421.) But the mechanics' lien and stop notice laws did not take defendants' property; Diamond took the property, and the question is whether the state, by reason of those laws, is so significantly involved in the taking that we may treat that taking as state action.

[11]The following discussion and resolution of the state action issue adheres closely to the analysis of the Court of Appeal opinion prepared by Presiding Justice George Brown.

for the conclusion that the imposition and enforcement of mechanics' liens and stop notices constitute state action.[12]

■ There is no question but that the mechanics' lien involves significant state action. Not only is the lien governed by detailed statutory provisions, but it becomes effective only upon recordation with the county recorder, an official of the state; moreover, it can be enforced only by resort to the state courts.[13]

■ The stop notice is equally subject to comprehensive statutory regulation; further, unlike the Mechanics' Lien Law, the stop notice statutes create a new remedy unknown to the common law.[14] Although the stop notice attaches without filing or recordation before any state official, that lien is effective only because the state statute permits a suit to impose personal liability upon a lender or owner who disregards the notice. Thus the filing and enforcement of the stop notice "is not just action against a backdrop of an amorphous state policy, but is instead action encouraged, indeed only made possible, by explicit state authorization." (*Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109, 114.)

[12]Diamond notes that in *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d 146, we upheld the garageman's lien to the extent that it permitted interim retention of the automobile (see at pp. 154-155), but struck down the statutes authorizing sale of the car without a hearing (at pp. 155-156). Diamond suggests that our holding in *Adams* rests on an implicit finding that the state was not significantly involved in the garageman's lien until the time of sale, and argues that the state is not significantly involved in the mechanics' lien or stop notice procedures until the claimant files suit to enforce his lien. This argument misconstrues *Adams,* which clearly held that the garageman's lien procedure as a whole involved state action, but that the garageman's interim retention of possession comported with due process. (See at pp. 152-154.)

[13]See Clark & Landers, *Sniadach, Fuentes and Beyond: The Creditor Meets the Constitution* (1973) 59 Va.L.Rev. 355, 402; Case Comment (1975) 55 B.U.L.Rev. 263, 264, footnote 4.

[14]In *Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d 352, 362-363, we suggested that private summary seizure would be more likely to constitute a form of state action if that seizure was based upon a statute which created a remedy unknown to the common law. This reasoning has been criticized on the ground that the degree of state involvement in the remedy does not turn upon the age or origin of the remedy (see Burke & Reber, *State Action, Congressional Power & Creditors' Rights: An Essay on the Fourteenth Amendment* (1973) 47 So.Cal.L.Rev. 1, 47-48), and indeed remedies of venerable common law origin such as garnishment and attachment have been held to involve state action. (*Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]; *Randone* v. *Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13].) We do not therefore rest our holding that stop notice procedures involve state action merely upon the fact that the procedure was created by statute.

Amicus, in arguing that mechanics' liens and stop notices do not involve state action, cites decisions upholding such self-help remedies as setoff (*Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d 352) and repossession (*Adams* v. *Southern California First National Bank, supra,* 492 F.2d 324; *Kipp* v. *Cozens, supra,* 40 Cal.App.3d 709). Both setoff and repossession, however, involve private action sufficient in itself to enforce the creditor's claim. The only state action there present consisted of legislative and judicial recognition of the lawfulness of the private action; the courts properly held such recognition did not constitute significant state involvement in the private act. (See discussion in *Kruger* v. *Wells Fargo Bank, supra,* 11 Cal.3d at pp. 363-364; *Adams* v. *Southern California First National Bank, supra,* 492 F.2d 324, 330.)

In contrast to the above private action, the state in the present case has not merely authorized the laborer and materialman to record a mechanics' lien, but compelled the owner, and any subsequent purchaser or encumbrancer, to recognize the priority of that lien; the state has not merely permitted the laborer and materialman to file a stop notice, but required the lender, on pain of personal liability, to withhold the claimed funds. Moreover, neither the mechanics' lien nor the stop notice can be enforced without the assistance of the state. Thus the level of state involvement here far transcends that present in the setoff and repossession cases.

4. *The mechanics' lien and stop notice laws comply with due process requirements.*

We turn now to the principal issue in this case—whether the procedures established by the mechanics' lien and stop notice laws comply with constitutional requirements. In other jurisdictions three federal district courts and the Georgia Supreme Court have upheld the constitutionality of mechanics' lien laws (*Cook* v. *Carlson, supra,* 364 F.Supp. 24; *Ruocco* v. *Brinker* (S.D.Fla. 1974) 380 F.Supp. 432; *Spielman-Fond, Inc.* v. *Hanson's, Inc., supra,* 379 F.Supp. 997, affd. 417 U.S. 901 [41 L.Ed.2d 208, 94 S.Ct. 2596]; *Tucker Door & Trim Corp.* v. *Fifteenth Street Co., supra,* 221 S.E.2d 433); state courts in Connecticut and Maryland have held their mechanics' lien laws unconstitutional (*Roundhouse Constr. Corp.* v. *Telesco Masons Supplies Co., supra,* 362 A.2d 778, vacated and remanded for a determination whether the decision rests on an independent state ground (1975) 423 U.S. 809 [46 L.Ed.2d 29, 96 S.Ct. 20], reaffd. on both state and federal grounds (1976) 365 A.2d 393; *Barry Properties, Inc.* v. *Fick Bros. Roofing Co., supra,* 353 A.2d 222). As to

California this issue is one of first impression. The California stop notice law is unique (see Note, *California's Private Stop Notice Law: Due Process Requirements* (1974) 25 Hastings L.J. 1043, 1054-1057); no decisions have considered the constitutionality of that law.

Resolution of the issue before us, consequently, turns not upon the application of specific precedent, but upon the general principles established by the line of decisions respecting creditors' remedies descended from *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820]. We first set forth the major cases in historical progression; thereafter, we analyze and find unacceptable plaintiff's contention that one of the most recent Supreme Court cases, *North Georgia Finishing, Inc.* v. *Di-Chem, Inc., supra,* 419 U.S. 601, controls the instant situation.

The seminal case of *Sniadach* itself held merely that wage garnishment without prior hearing was unconstitutional, leaving for later resolution the constitutionality of other remedies. *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983], a four-to-three decision, struck down Florida and Pennsylvania replevin statutes on the ground that "They allow summary seizure of a person's possessions when no more than private gain is directly at stake," (p. 92 [32 L.Ed.2d p. 577]) asserting that a *preseizure hearing* was essential except in "extraordinary . . . truly unusual" situations. (407 U.S. at p. 90 [32 L.Ed.2d at pp. 575-576].)

Two years later, in *Mitchell* v. *W. T. Grant Co.* (1974) 416 U.S. 600 [40 L.Ed.2d 406, 94 S.Ct. 1895], the court severely limited the scope of *Fuentes.* W. T. Grant had sold household appliances to Mitchell under an installment contract. When Mitchell failed to make installment payments, W. T. Grant seized the appliances pursuant to a Louisiana law which authorized courts to issue a writ of sequestration based on an ex parte judicial determination. Although the sequestration law provided no notice or hearing before the seizure, a majority of the court upheld its constitutionality.

Writing for the majority, Justice White observed that: "Plainly enough, this is not a case where the property sequestered by the court is exclusively the property of the defendant debtor. The question is not whether a debtor's property may be seized by his creditors, pendente lite, where they hold no present interest in the property sought to be seized. The reality is that both seller and buyer had current, real interests in the

property . . . . Resolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well." (416 U.S. at p. 604 [40 L.Ed.2d at p. 412].)

*Fuentes,* the court held, did not impose a rigid requirement for a preseizure hearing. "The requirements of due process of law 'are not technical, nor is any particular form of procedure necessary.' *Inland Empire Council* v. *Millis,* 325 U.S. 697, 710 (1945). . . . 'The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' *Cafeteria Workers* v. *McElroy,* 367 U.S. 886, 895 (1961); *Stanley* v. *Illinois,* 405 U.S. 645, 650 (1972)." (P. 610 [40 L.Ed.2d p. 415].)

The court then reviewed the safeguards included in Louisiana's sequestration procedure. Noting that the act narrowly limited the grounds upon which the writ may issue, required bonding of the creditor and judicial examination of the application for the writ, provided for a prompt post-lien hearing, and granted the debtor a cause of action for wrongful seizure, the court concluded that "Considering the Louisiana procedure as a whole, we are convinced that the State has reached a constitutional accommodation of the respective interests of buyer and seller." (*Ibid.*)

When the court decided *Mitchell* on May 14, 1974, it had pending before it both an appeal in *Spielman-Fond, Inc.* v. *Hanson's Inc., supra,* 379 F.Supp. 997, a decision of a three-judge district court upholding the constitutionality of the Arizona mechanics' lien law, and a petition for certiorari in *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.* (1973) 231 Ga. 260 [201 S.E.2d 321], a state court decision upholding the constitutionality of Georgia's garnishment law. Two weeks later, on May 28, the court affirmed the decision in *Spielman-Fond* in a one-line, unanimous opinion. (417 U.S. 901 [41 L.Ed.2d 208, 94 S.Ct. 2596].) On the same day the court granted certiorari in *North Georgia.* (417 U.S. 907 [41 L.Ed.2d 210, 94 S.Ct. 2601].)

The court handed down its opinion in *North Georgia* the following term, with Justice White, author of the majority opinion in *Mitchell,* again writing for the court. Comparing *North Georgia* to *Mitchell* v. *W. T. Grant,* Justice White noted that the Louisiana statute sustained in *Mitchell* required judicial examination of the creditor's factual affidavit before the writ issued, and entitled the debtor to a prompt post-lien

hearing. "The Georgia Garnishment statute," he stated, "has none of the saving characteristics of the Louisiana statute." (419 U.S. at p. 607 [42 L.Ed.2d at p. 757].) Georgia law permitted a court clerk to issue a writ of garnishment on the basis of conclusory affidavits submitted by the creditor. "Upon service of the writ, the debtor is deprived of the use of the property in the hands of the garnishee" (*ibid.*); "the debtor's bank account was impounded, and, absent a bond, put totally beyond use during the pendency of the litigation." (P. 606 [42 L.Ed.2d p. 757].) The Georgia statute did not provide "for an early hearing at which the creditor would be required to demonstrate at least probable cause for the garnishment. Indeed, it would appear that without the filing of a bond the defendant debtor's challenge to the garnishment will not be entertained, whatever the grounds may be." (P. 607 [42 L.Ed.2d pp. 757-758].) The court accordingly found the Georgia garnishment law unconstitutional.

Plaintiffs maintain that the decision in *North Georgia* controls the case at bar and establishes that no summary creditors' remedy is constitutional unless the statute provides for both prior judicial authorization and an early post-taking hearing. We explain the reasons why we reject plaintiff's interpretation of the Supreme Court decision.

In the first place, the Supreme Court summarily affirmed the district court's decision in *Spielman-Fond,* a Supreme Court decision on the merits (see *Ohio* ex rel. *Eaton* v. *Price* (1959) 360 U.S. 246, 247 [3 L.Ed.2d 1200, 1202, 79 S.Ct. 978]), upholding the constitutionality of a mechanics' lien law substantially identical to the California statute. *Spielman-Fond* was not expressly overruled by *North Georgia,* and remains today the only Supreme Court ruling upon the merits of a constitutional challenge to the mechanics' lien laws.

In the second place, *North Georgia* and *Spielman-Fond* are distinguishable and thus *North Georgia* did not impliedly overrule *Spielman-Fond.*[15] As the Maryland Court of Appeals observed: "The Arizona law upheld in *Spielman-Fond,* although it did not provide for notice or a prior hearing, requires the claim to a lien to be made under oath, on personal knowledge and recorded within sixty or ninety days; the owner to be notified within a reasonable time of the filing of the claim; the claimant to institute a suit to enforce the lien within six months after its

---

[15]The fact that the Supreme Court affirmed the judgment in *Spielman-Fond* on the same day that it granted certiorari in *North Georgia* suggests that the court may have compared the two cases, and concluded that they presented distinguishable legal issues.

filing; and permits the owner to discharge the lien by filing a bond. . . . Consequently, the Supreme Court may have thought that the Arizona statute [in contrast to the Georgia garnishment statute] contained enough safeguards to satisfy due process." (*Barry Properties, Inc.* v. *Fick Bros. Roofing Co., supra,* 353 A.2d 222, 233-234.)

The California statutes challenged here contain *more* safeguards than the Arizona statute approved in *Spielman-Fond.* As in Arizona, claims of lien and stop notices must be signed and verified (§§ 3084, 3103); additionally, a lender may disregard an unbonded stop notice. Unlike the Arizona procedure, the California claimant must notify the owner before he asserts the lien. (§ 3097.) The California owner and lender can not only secure the release of an existing mechanics' lien or stop notice by filing a bond (§§ 3143, 3171), but can also, by recording a payment bond, secure advance protection against any lien or notice (§§ 3139, 3161, 3162, 3235). Finally, while the Arizona law required suit by the claimant within six months, California enforces a 90-day period of limitation.

In the third place, even without reliance upon *Spielman-Fond* and the provisions of the Arizona law there upheld, the characteristics of the California mechanics' lien and stop notice laws differ so significantly from the garnishment law struck down in *North Georgia* that the *North Georgia* decision cannot control the outcome of the present case.

First, the Georgia garnishment law permitted the creditor to deprive the debtor of the interim use of a bank account utilized to pay ordinary business expenses; it was "put totally beyond use during the pendency of the litigation." (419 U.S. at p. 606 [42 L.Ed.2d at p. 757].) The California mechanics' lien, as we explain in more detail later, does *not* deprive the owner of the interim use of property or of its possession; the stop notice deprives him only of the interim use of a *special fund* set aside to pay construction debts and not available for ordinary expenses. The Georgia law thus worked a far more severe deprivation upon the property owner than California's mechanics' lien and stop notice laws.

Second, the Georgia law could not be justified by the presence of the creditor's interest in the property seized. The Georgia garnishment law permitted the creditor to garnish *any* account of the debtor, regardless of whether the creditor had any interest in that account. The California statutes, on the other hand, permit laborers and materialmen to place a

lien only on property whose value they have enhanced by their labor, and to garnish only accounts set aside to pay their claims. Hence in the present case the admonition of *Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. 600, 604 [40 L.Ed.2d 406, 411-412], applies: that when the creditor has an *interest* in the property seized, resolution of the due process question requires an accommodation of the interests of *both* creditor and debtor. In *North Georgia,* the absence of a creditor interest in the seized property enabled the court to pass lightly over the process of accommodating competing interests; that decision cannot dictate the resolution of the viable compound of competing interests in the instant case.

This distinction is carefully explained in *Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, a case upon which the dissent heavily relies. In that case we held that statutes which required a plaintiff who sued a public entity to post an undertaking for costs denied such plaintiff due process of law. Distinguishing *Mitchell* v. *W. T. Grant Co., supra,* we stated that: "In *Mitchell* the party who suffered the taking as well as the party who benefitted thereby had 'current, real interests in the property.' The high court emphasized that the '[r]esolution of the due process question must take account not only of the interests of the buyer of the property but those of the seller as well.' (*Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. at p. 604 [40 L.Ed.2d at p. 412].) We, too, have recognized the need to accommodate competing interests of two parties in the same property when determining the constitutional requisites for a valid taking. (See, e.g., *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d at pp. 154-155.) Unlike the statute in *Mitchell,* the statutes now before us deprive the plaintiff of property in which the defendant has no competing interest." (P. 464.)

*Beaudreau* cites *Mitchell* and *Adams* as examples of cases in which the court must accommodate competing interests. In *Mitchell* the competing interests arose because the seller reserved a security interest in property in possession of the buyer; in *Adams* the repairman by his labor and materials increased the value of the debtor's car, and sought to retain the car as security for payment. The present case resembles both precedents; here the mechanic by his labor and materials has enhanced the value of realty in the owner's possession, and requires a lien to ensure that he will be paid for his efforts. Thus, as *Beaudreau* indicates, we cannot determine the requisites of due process in the present case by blindly following language from cases which did not involve competing interests; we must instead direct our attention to identifying, weighing, and

accommodating the competing interests arising under the mechanics' lien and stop notice laws.

Third, the Georgia garnishment law provided no means by which the debtor could seek a speedy post-lien hearing and, in fact, barred a debtor from contesting the validity of the garnishment unless he posted a bond. California law, in contrast, offers equitable remedies which the owner or lender can employ to obtain a speedy hearing on the probable validity of the lien.

Before recording a mechanics' lien or filing a stop notice, the claimant must serve a preliminary notice upon the owner, the contractor, and the construction lender.[16] (§§ 3097, 3114, 3160.) Upon receipt of such a notice from one not entitled to claim a lien, the owner or lender may immediately file suit to enjoin the claimant from asserting his lien. (Code Civ. Proc., § 526.) By the use of a temporary restraining order if necessary (see Code Civ. Proc., § 527), the plaintiff could secure a hearing before the lien was imposed.[17]

Even after the lien has been recorded, or the stop notice filed, the owner in many instances could seek a mandatory injunction ordering the

---

[16]Although the California statutes do not provide for prior judicial scrutiny of the papers on which the lien is based, this lacuna is of little significance. An ex parte judicial examination of documents submitted solely by the claimant would in most cases provide only an illusory protection. (See Case Comment (1975) 55 B.U.L.Rev. 263, 285.) By granting the owner advance notice of the lien—a safeguard not provided by the sequestration law upheld in *Mitchell*—the California statutes permit the owner to investigate the basis of the lien and to seek a hearing before the lien becomes effective, a protection of much greater value than the Louisiana debtor's right to ex parte judicial review of the application for a writ of sequestration.

[17]In *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d 146, we held the owner's opportunity to seek injunctive relief insufficient to avoid the unconstitutionality of the statutes providing for sale of a car subject to a garageman's lien without notice and hearing, on the ground that "Since temporary injunction is an extraordinary remedy and is thus discretionary . . ., it lacks the certainty necessary to *insure a hearing prior to permanent deprivation.*" (11 Cal.3d at p. 156.) (Italics added.) In the case of mechanics' liens and stop notices, however, the owner is entitled by *statute* to a hearing before he is *permanently* deprived of his property by enforcement of those liens. The purpose of an action for injunctive relief, thus, is merely to obtain a hearing *prior* to the imposition of an interim lien which imposes relatively minor restrictions upon the use of the property. (See discussion at p. 825, *post.*) Since the constitutionality of such an interim deprivation does not require final proof of the validity of the lien, but only proof of probable cause (*North Georgia Finishing, Inc.* v. *Di-Chem, Inc., supra,* 419 U.S. 601, 607 [42 L.Ed.2d 751, 757]; *id.,* conc. opn. of Powell, J., 419 U.S. at p. 612 [42 L.Ed.2d at p. 760]), the hearing upon a motion for preliminary injunction should meet the constitutional standards.

claimant to release the lien.[18] (See *People* v. *Paramount Citrus Assn.* (1957) 147 Cal.App.2d 399, 413 [305 P.2d 135]; 2 Witkin, Cal. Procedure (2d ed. 1970) pp. 1515-1516.) In any event, the owner need not wait until the claimant sues to enforce the lien; the imposition of that lien, and the owner's denial of its validity, comprise a controversy sufficient to permit an immediate suit for declaratory relief. (See Code Civ. Proc., § 1060.) Such a declaratory relief action can claim priority on the calendar of the trial court. (Code Civ. Proc., § 1062a.)[19] Thus by filing an action for injunctive or declaratory relief, the owner or lender can obtain a hearing either before imposition of the lien or within a reasonable period thereafter.

More fundamentally, the plaintiff's reliance upon *North Georgia* to establish inflexible requirements for summary creditors' remedies conflicts with the basic philosophy of procedural due process established in an array of recent decisions. ■ As summarized in the court's most recent opinion on procedural due process *Mathews* v. *Eldridge* (1976) 424 U.S. 319 [47 L.Ed.2d 18, 96 S.Ct. 893]: "These decisions underscore the truism that ' "[d]ue process," unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria & Restaurant Workers Local 473* v. *McElroy,* 367 U.S. 886, 895 (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrisey* v. *Brewer,* 408 U.S. 471, 481 (1972). Accordingly, *resolution of the issue whether the . . . procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected.*" (Italics added.) (P. 334 [47 L.Ed.2d p. 33].)

This expression of the principle of procedural due process in *Mathews* echoes the court's earlier holding in *Mitchell.* As we have noted, the

[18]Despite the statutory requirement for a 20-day preliminary notice (§ 3097), in some cases the owner or lender will not learn of the defect in the lien until after the lien has been imposed. An obvious example is the lien which is defective on the ground that the lienor failed to comply with the preliminary notice requirement. Additionally, the preliminary notice need only state "A general description of the labor . . . or materials furnished or to be furnished, and if there is a construction lender, he shall be furnished with an estimate of the total price thereof . . . ." (§ 3097, subd. (c)(1).) Thus a dispute concerning the exact amount due might not crystalize until after the lien is imposed.

[19]The dissent suggests that the mechanics' lien and stop notice laws, by providing for a speedy hearing on public stop notices, impliedly bar resort to equitable remedies to secure a speedy hearing on mechanics' liens and private stop notices. This interpretation of the statutes is not only destitute of authority or legislative history, but runs afoul of the principle that the courts must construe legislation to uphold its validity. (See *Braxton* v. *Municipal Court* (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697]; *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142].)

court there upheld the constitutionality of the alleged provision on the ground that "the State has reached a constitutional accommodation of the respective interests of buyer and seller."[20] (416 U.S. at p. 610 [40 L.Ed.2d at p. 415].)

We do not believe *North Georgia* should be interpreted as an aberrational departure from this consistent line of decisions that attempt to resolve due process issues by identifying and accommodating competing governmental and private interests. Although *North Georgia* emphasized that the Georgia garnishment statute lacked the safeguards of the Louisiana law upheld in *Mitchell,* the court did not assert that the safeguards incorporated in the Louisiana law are the *only* safeguards that will pass constitutional muster. *Mitchell* itself placed no stress on any particular procedural device, but proclaimed that due process adjudication was not a matter of enforcing inflexible rules but of accommodating competing interests; *North Georgia,* authored by the same justice who wrote for the *Mitchell* majority, did not reject that philosophy. We therefore view *North Georgia* not as a decision repudiating the accommodation of the interests required by *Mitchell,* but as applying that method to strike down a statute which did not properly accommodate such competing interests, but instead, provided virtually no safeguards against a creditor's improper seizure of property in which he had no interest. (See Pearson, *Due Process and the Debtor: The Impact of Mitchell v. W. T. Grant* (1975) 28 Okla.L.Rev. 743, 791-792; 28 Vand.L.Rev. (1975) 908, 918.)

■ In conclusion, this case cannot be decided simply by laying the California laws alongside the Louisiana law approved in *Mitchell,* and

[20]Other cases follow the approach of accommodating the interests of the debtor and creditor in upholding the constitutionality of legislation similar to the instant statutes. *Cook* v. *Carlson, supra,* 364 F.Supp. 24 suggests a process of accommodating competing interests in which the requirements of due process, as applied to creditors' remedies, depend "upon a judicial weighing of the seriousness of the deprivation against the importance of the governmental or public interest served by summary procedures." (364 F.Supp. 24, 25.) Discussing the constitutionality of attachment of real property, *Central Sec. Nat. Bank of Lorain Cty.* v. *Royal Homes, Inc.* (E.D.Mich. 1974) 371 F.Supp. 476, 480, stated that "The defendants' right to use, possess and alienate their property pending the outcome of the litigation must be balanced against the plaintiff's right to preserve an asset of the defendants to be used in satisfaction of plaintiff's judgment." To the same effect: *Lindsey* v. *Normet* (1972) 405 U.S. 56 [31 L.Ed.2d 36, 92 S.Ct. 862] (unlawful detainer); *Jonnet* v. *Dollar Sav. Bank of City of New York* (3d Cir. 1976) 530 F.2d 1123 (attachment); *Ruocco* v. *Brinker, supra,* 380 F.Supp. 432, 437 (mechanics' lien); *Property Research Financial Corp.* v. *Superior Court* (1972) 23 Cal.App.3d 413, 420 [100 Cal.Rptr. 233] (attachment of property of nonresident). (See also *Empfield* v. *Superior Court, supra,* 33 Cal.App.3d 105, 108 (lis pendens); Note (1975) 88 Harv.L.Rev. 1510, 1515 and fn. 26.)

then striking down the California law because it contains different safeguards than did the Louisiana law. "Identification of the precise dictates of due process requires consideration of both the governmental function involved and the private interests affected." (*Fusari* v. *Steinberg* (1975) 419 U.S. 379, 389 [42 L.Ed.2d 521, 529, 95 S.Ct. 533]; see *Mathews* v. *Eldridge, supra,* 424 U.S. 319, 334 [47 L.Ed.2d 18, 33].) No shortcut will enable us to adjudicate the constitutionality of the California mechanics' lien and stop notice laws without undertaking the task of identifying and accommodating the competing interests involved. To that analysis we now turn.

We weigh, first, the seriousness of the deprivation caused the debtor, since "the degree of potential deprivation . . . is a factor to be considered in assessing the validity of any . . . decisionmaking process." (*Mathews* v. *Eldridge, supra,* 424 U.S. at p. 341 [47 L.Ed.2d at p. 37].) Although we concluded earlier in this opinion that the taking of property occasioned by a stop notice or mechanics' lien is not de minimis (see *ante* at pp. 811-814), it is nonetheless of relatively minor effect. Most creditors' remedies—attachment; garnishment; replevin; the landlord's, innkeeper's, or garageman's liens—deprive the debtor of the possession and use of property which may be essential to his subsistence. The mechanics' lien, however, does not deprive the owner of the interim possession or use of the liened property; although the stop notice may deprive the owner of the use of funds, the stop notice lien attaches only to a limited line of credit set aside to pay construction expenses.

Turning, second, to the interests of the laborers and materialmen, we note the historical recognition of the importance of these liens. These liens can be asserted only by persons who have contributed labor or supplied materials; the claimant has helped to create an improvement which enhances the value of that realty. As explained in the early decision of *Tuttle* v. *Montford* (1857) 7 Cal. 358, 360: "The lien of the mechanic, artisan, and materialman, is more equitable and more favored in law, because those parties have, at least in part, created the very property upon which the lien attaches . . . ."[21]

In this respect the present case is analogous to *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d 146, which upheld an interim retention

---

[21]See also *Humboldt Lumber Mill Co.* v. *Crisp* (1905) 146 Cal. 686, 687-688 [81 P. 30]; *L.A. etc. Brick Co.* v. *L.A. etc. Dev. Co.* (1908) 7 Cal.App. 460, 461 [94 P. 775].

of possession under a garageman's lien. Distinguishing cases striking down attachment, garnishment, and replevin, we observed that "Usually the claim of an attaching or garnisheeing creditor is a general claim unrelated to the specific property seized. And while the claim of a conditional vendor or chattel mortgagee arises out of a transaction involving the seized chattel itself, the interest of such creditor in the seized chattel is ordinarily purely pecuniary; the creditor has not, subsequent to the acquisition of the chattel by the vendee or mortgagee, *mixed his own labor with it, nor,* more significantly, *has he added to it materials to which he originally had a right of possession.*" (11 Cal.3d at pp. 154-155; see also *Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, 464.) (Italics added.)

The remedy of stop notice is also limited to persons who supply labor or materials (§§ 3158, 3159), and, when served upon the construction lender, attaches only to funds previously committed to finance construction of the improvement (§ 3162). Although the work of the laborer and goods of the materialman do not *directly* enhance the value of the loan funds, that fund is commonly secured by a trust deed upon the real property where the improvement is constructed. By enhancing the value of that realty, the laborer and materialman also increase the security of the fund. (*H. O. Bragg Roofing, Inc.* v. *First Federal Sav. & Loan Assn., supra,* 226 Cal.App.2d 24, 28; *Rossman Mill & Lbr. Co.* v. *Fullerton S. & L. Assn., supra,* 221 Cal.App.2d 705, 709.)

The mechanics' lien derives from the California Constitution itself; the Constitution of 1879 mandated the Legislature to grant laborers and materialmen a lien upon the property which they have improved;[22] no other creditors' remedy stems from constitutional command. (See *Martin* v. *Becker* (1915) 169 Cal. 301, 316 [146 P. 665].) Indeed this state, from the earliest days, and consistently thereafter has asserted its interest in protecting the claims of laborers and materialmen. In 1850 the first session of the California Legislature enacted a mechanics' lien law (Stats. 1850, ch. 87, §§ 1-14, at pp. 211-213).[23] Moreover, the courts have uniformly classified the mechanics' lien laws as remedial legislation, to

[22] Article XX, section 15 provides as follows: "Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished; and the Legislature shall provide, by law, for the speedy and efficient enforcement of such liens."

[23] See *Tuttle* v. *Montford, supra,* 7 Cal. 358, 360; *Homestead Sav. & Loan Assn.* v. *Superior Court* (1961) 195 Cal.App.2d 697, 700 [16 Cal.Rptr. 121]; *MacQuiddy* v. *Rice* (1941) 47 Cal.App.2d 755, 757 [118 P.2d 853].

be liberally construed for the protection of laborers and materialmen.[24] When the practice of recording a construction loan trust deed before the commencement of construction reduced the effectiveness of the mechanics' lien, the courts and the Legislature evolved alternative remedies—the equitable lien[25] and the stop notice—which attach directly to the loan fund.

This protective policy continues to serve the needs of the construction industry. As was pointed out in *Cook* v. *Carlson, supra,* 364 F.Supp. 24, 29: "Labor and material contractors [in the construction industry] are in a particularly vulnerable position. Their credit risks are not as diffused as those of other creditors. They extend a bigger block of credit, they have more riding on one transaction, and they have more people vitally dependent upon eventual payment. They have much more to lose in the event of default. There must be some procedure for the interim protection of contractors in this situation." Without such interim protection, the improvement may be completed, the loan funds disbursed, and the land sold before the claimant can obtain an adjudication on the merits of his claim.

In summary, we conclude that the recordation of a mechanics' lien, or filing of a stop notice, inflicts upon the owner only a minimal deprivation of property; that the laborer and materialman have an interest in the specific property subject to the lien since their work and materials have enhanced the value of that property; and that state policy strongly supports the preservation of laws which give the laborer and materialman security for their claims. In measuring these values, we do not deal in cold abstractions: we take into account the social effect of the liens and the interests of the workers and materialmen that the liens are designed to protect. We measure these valued interests against the loss, if any, caused to the owner. The balance tips in favor of the worker and the materialman; we conclude that the safeguards provided by California

[24]See *Hendrickson* v. *Bertelson* (1934) 1 Cal.2d 430, 432-438 [35 P.2d 318]; *Corbett* v. *Chambers* (1895) 109 Cal. 178, 184 [41 P. 873]; *Nolte* v. *Smith* (1961) 189 Cal.App.2d 140, 144 [11 Cal.Rptr. 261, 87 A.L.R.2d 996].

[25]Under the theory of equitable lien, the courts held that a person who was induced to supply labor and materials in reliance upon the construction loan fund could assert a lien against that fund. (See *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 732; *Smith* v. *Anglo-California Trust Co.* (1928) 205 Cal. 496, 501-504 [271 P. 898]; *Miller* v. *Mountain View Sav. & L. Assn.* (1965) 238 Cal.App.2d 644, 661-662 [48 Cal.Rptr. 278].) The enactment of Civil Code section 3264 in 1969 abolished the nonstatutory equitable lien. (*Boyd & Lovesee Lumber Co.* v. *Western Pacific Financial Corp.* (1975) 44 Cal.App.3d 460, 465 [118 Cal.Rptr. 699].)

law to protect property owners against unjustified liens are sufficient to comply with due process requirements.[26] We therefore uphold the constitutionality of the mechanics' lien and stop notice laws.[27]

The alternative writs of mandate and prohibition issued by the Court of Appeal are discharged, and the peremptory writs denied.

Wright, C. J., Mosk, J., and Sullivan, J., concurred.

RICHARDSON, J.—I respectfully dissent. Neither the California mechanics' lien law (Civ. Code, § 3109 et seq.) nor the stop notice procedures applicable to private construction (*id.*, § 3156 et seq.) meet the due process requirements of the United States Constitution as recently interpreted by the federal Supreme Court and by us. Both creditor's remedies fail to afford those minimal protections currently mandated and are, in my view, unconstitutional under the reasoning of federal and state decisions following the important case of *Sniadach* v. *Family Finance Corp.* (1969) 395 U.S. 337 [23 L.Ed.2d 349, 89 S.Ct. 1820].

The majority make two preliminary concessions as I believe they must. First, they acknowledge that both the recordation of a mechanics' lien and the filing of a stop notice constitute a "taking" of property. Second, they conclude that both the lien and the stop notice involve "state action" to a degree invoking constitutional review. Accepting the foregoing, however, and at this point we part company, the majority conclude that both procedures meet current due process demands.

My principal disagreement focuses on the majority's insistence that the challenged creditor's remedies furnish sufficient procedural safeguards under those applicable decisions of the United States Supreme Court and of this court to which I now turn. As recognized by the majority, the most recent pronouncement of the high court on the due

---

[26]We hold only that the present statutory and judicial remedies against invalid liens are adequate to avoid the unconstitutionality of the mechanics' lien and stop notice laws, not that no better remedy can be fashioned. We note, for example, that the Legislature has provided a special summary procedure for determining the validity of stop notice claims on public projects. (§§ 3197-3205.) The extension of such a procedure to encompass stop notices on private improvements, and possibly mechanics' liens, might provide the private owners and lenders with a remedy superior to that afforded by injunctive or declaratory relief. (See Note, *California's Private Stop Notice Law: Due Process Requirements* (1974) 25 Hastings L.J. 1043, 1072-1073.)

[27]Our conclusion, founded upon both federal and state precedent, applies equally to the due process clauses of the federal and state Constitutions.

process requirements in this area is *North Georgia Finishing, Inc.* v. *Di-Chem, Inc.* (1975) 419 U.S. 601 [42 L.Ed.2d 751, 95 S.Ct. 719]. *North Georgia* and our own very recent careful analysis in *Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448 [121 Cal.Rptr. 585, 535 P.2d 713], in my view, furnish adequate guidance for the proper resolution of this case.

*North Georgia* must be viewed and understood in its historic and developmental context. In 1969 the Supreme Court in *Sniadach, supra,* struck down a Wisconsin wage garnishment statute which had permitted a creditor without prior hearing to attach, and compel an employer to withhold, one-half of a debtor's wages pending a court order. The Supreme Court found such summary proceedings invalid save in "extraordinary situations" since, affording neither advance notice nor hearing, they violated due process protections. The trail-blazing implications of *Sniadach* triggered an important series of cases, both federal and state, in the creditor-debtor field. In 1972 the Supreme Court, addressing Florida and Pennsylvania claim and delivery statutes, spoke again in *Fuentes* v. *Shevin* (1972) 407 U.S. 67 [32 L.Ed.2d 556, 92 S.Ct. 1983], to the effect that advance notice and a hearing were requisite due process elements before property could be taken. Significantly for our purposes the high court declined in *Fuentes* to recognize distinctions of grade in the character of the affected property interests, concluding that "*[a]ny significant taking of property by the State is within the purview of the Due Process Clause.* While the length and consequent severity of a deprivation may be another factor to weigh in determining the appropriate form of hearing, it is not decisive of the basic right to a prior hearing of some kind." (P. 86 [32 L.Ed.2d p. 573], italics added.) The Fourteenth Amendment extends its "protection to '*any* significant property interest'." (*Ibid.,* italics added.)

California courts quickly caught the *Sniadach* signal. Thus in 1970 in *McCallop* v. *Carberry* (1970) 1 Cal.3d 903 [83 Cal.Rptr. 666, 464 P.2d 122], and *Cline* v. *Credit Bureau of Santa Clara Valley* (1970) 1 Cal.3d 908 [83 Cal.Rptr. 669, 464 P.2d 125], we invalidated on similar due process grounds the California wage garnishment law because the legislation did not provide for notice and prior hearing. (Code Civ. Proc., § 690.11.) The following year in *Blair* v. *Pitchess* (1971) 5 Cal.3d 258 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], we declared unconstitutional on similar grounds the statutory claim and delivery procedure. (Code Civ. Proc., §§ 509-521.) This was soon followed by *Randone* v.

*Appellate Department* (1971) 5 Cal.3d 536 [96 Cal.Rptr. 709, 488 P.2d 13], in which we struck down the California attachment statute. (*Id.,* § 537, subd. 1.) Numerous other federal and state cases have followed the trend. By consistent reasoning California courts have either found unconstitutional or substantially limited, as violative of due process standards, such creditor's remedies as: garageman's lien (*Adams* v. *Department of Motor Vehicles* (1974) 11 Cal.3d 146 [113 Cal.Rptr. 145, 520 P.2d 961, 64 A.L.R.3d 803]); banker's lien (*Kruger* v. *Wells Fargo Bank* (1974) 11 Cal.3d 352 [113 Cal.Rptr. 449, 521 P.2d 441]); unlawful detainer (*Damazo* v. *MacIntyre* (1972) 26 Cal.App.3d 18 [102 Cal.Rptr. 609], hg. den.; *Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1 [94 Cal.Rptr. 904], hg. den.); dispossession of realty (*Mihans* v. *Municipal Court* (1970) 7 Cal.App.3d 479 [87 Cal.Rptr. 17]); see also innkeeper's lien (*Klim* v. *Jones* (N.D.Cal. 1970) 315 F.Supp. 109; *Collins* v. *Viceroy Hotel Corporation* (N.D.Ill. 1972) 338 F.Supp. 390); and imprisonment of judgment debtor (*Desmond* v. *Hachey* (D.Me. 1970) 315 F.Supp. 328).

In 1972, the United States Supreme Court in *Fuentes* seemed to have adopted a strict requirement that when a property right was taken or impaired there must be a *prior* notice and opportunity to be heard. This more severe and restrictive interpretation was tempered somewhat in 1974 by the high court's ruling in *Mitchell* v. *W. T. Grant Co.* (1974) 416 U.S. 600 [40 L.Ed.2d 406, 94 S.Ct. 1895]. In *Mitchell* the court reviewed and upheld a Louisiana sequestration statute which it found significantly different from the replevin statutes of Florida and Pennsylvania invalidated in *Fuentes.* In *Mitchell* the affidavit supporting the possessory writ required the vendor-claimant to furnish detailed information regarding his claim, the writ was reviewed and issued by a judge rather than a clerk, the claimant's possessory right arose from a statutory vendor's lien giving him possession on default, and the debtor was given an *immediate* statutorily created *post*-seizure hearing on the merits of the claim. Thus, the *Fuentes* preseizure hearing stricture was moderated somewhat by *Mitchell* while the high court stressed the vital protection afforded by a *judge* in the exercise of the creditor's remedy.

The Supreme Court's most recent expression of the due process requirements is *North Georgia,* in which it held unconstitutional Georgia's garnishment statute on the expressed grounds that it permitted a taking of the debtor's property *"without . . . opportunity for an early hearing and without participation by a judicial officer."* (419 U.S. 601 at p. 606 [42 L.Ed.2d at p. 757], italics added.) The high tribunal emphasized

that under Georgia law the writ of garnishment was issuable "by the court clerk, without participation by a judge," and "the only method discernible on the face of the statute to dissolve the garnishment was to file a bond to protect the plaintiff creditor." (*Id.,* at p. 607 [42 L.Ed.2d at pp. 757-758].) The court further observed that "There is no provision for *an early hearing* at which the creditor would be required to demonstrate at least probable cause for the garnishment. Indeed, it would appear that without the filing of a bond the defendant debtor's challenge to the garnishment will not be entertained, whatever the grounds may be." (*Ibid.,* italics added.) Holding that this was entirely unacceptable, the high court expressly distinguished its decision in *Mitchell* on the grounds that the Louisiana sequestration statute upheld in that case required *judicial* authorization to issue the writ, and in the court's words "expressly entitled the debtor to an *immediate* hearing after seizure and to dissolution of the writ absent proof by the creditor of the grounds on which the writ was issued." (*Ibid.,* italics added.)

Thus in *North Georgia,* in clear and unmistakable language, the United States Supreme Court faithfully continuing the consistent course inaugurated in *Sniadach* has held that a taking of property is unconstitutional, even if the taking be temporary in nature, and even if the property may be released by filing a bond, unless the *statute* contains express provisions for *prior judicial authorization and* an *early* post-taking *hearing* on the merits of the creditor's claim.

While it is true, as the majority note, that in May 1974 the United States Supreme Court summarily, and without opinion, affirmed the case of *Spielman-Fond, Inc.* v. *Hanson's, Inc.,* (D.Ariz. 1973) 379 F.Supp. 997, affirmed (1974) 417 U.S. 901 [41 L.Ed.2d 208, 94 S.Ct. 2596], a case which had upheld the constitutionality of a mechanics' lien law similar to California's, the Supreme Court's summary affirmance occurred *prior to North Georgia.* Accordingly, *Spielman-Fond* by well established principles has very limited force and is by no means dispositive of the very serious constitutional issue herein presented. As Chief Justice Burger has recently explained, "When we summarily affirm, without opinion, the judgment of a three-judge District Court we affirm the judgment but not necessarily the reasoning by which it was reached. [Fn. omitted.] An unexplicated summary affirmance settles the issues for the parties, and is not to be read as a renunciation by this Court of doctrines previously announced in our opinions after full argument. Indeed, upon fuller consideration of an issue under plenary review, *the Court has not*

*hesitated to discard a rule which a line of summary affirmances may appear to have established.* [Citations.]" (*Fusari* v. *Steinberg* (1975) 419 U.S. 379, 391-392 [42 L.Ed.2d 521, 530-531, 95 S.Ct. 533], conc. opn. by Burger, C. J., italics added; see *Edelman* v. *Jordan* (1974) 415 U.S. 651, 670-671 [39 L.Ed.2d 662, 676-677, 94 S.Ct. 1347] ["Since we deal with a constitutional question, we are less constrained by the principle of *stare decisis* than we are in other areas of the law."]; *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 616-617 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].)

Moreover, it is significant as the majority note that *Spielman-Fond* was decided prior to the recent decisions of two of our sister states, Connecticut and Maryland, which held the mechanics' lien laws of those states unconstitutional for reasons substantially identical to those set forth below. (See *Barry Properties, Inc.* v. *Fick Bros. Roofing Co.* (1976) 277 Md. 15 [353 A.2d 222]; *Roundhouse Constr. Corp.* v. *Telesco Masons Supplies Co.* (1975) 168 Conn. 371 [362 A.2d 778].) The courts in these two cases were, of course, aware of the Supreme Court's summary affirmance of *Spielman-Fond.* For the foregoing reasons, I suggest that we must measure the constitutionality of the California mechanics' lien and stop notice laws by the most recent requirements of the Supreme Court in *North Georgia,* rather than to speculate as to the significance of the high court's summary affirmance of an earlier proceeding.

Of perhaps even greater significance is the fact that following *North Georgia,* we ourselves in *Beaudreau* v. *Superior Court* (1975) 14 Cal.3d 448 [121 Cal.Rptr. 585, 535 P.2d 713], reviewed at considerable length the appropriate due process demands when, as here, property is "taken." The *Beaudreau* analysis developed, in my view, is fully dispositive of the issue before us, for we carefully considered the essential elements of due process protections as currently mandated. We examined the constitutionality of a statutory scheme whereby plaintiffs suing public entities were required either to file an undertaking for costs, or deposit in court a cash amount in lieu of a bond. We observed initially that a "taking" occurred either by reason of the exaction of a nonrefundable bond premium or the temporary loss of use of the cash deposit. (Pp. 455-456.) We reiterated our prior observation in *Brooks* v. *Small Claims Court* (1973) 8 Cal.3d 661, 666 [105 Cal.Rptr. 785, 504 P.2d 1249], that the concept of a taking " '. . . has been held to include even *temporary deprivations of property.*' " (P. 455, italics added.) Then, we explained in definitive terms that, by reason of prior decisions of the United States Supreme Court and this court, ". . . *in every case involving a deprivation of*

*property within the purview of the due process clause, the Constitution requires some form of notice and a hearing.* [Citations.] Absent *extraordinary* circumstances justifying resort to summary procedures, this hearing must take place *before* an individual is deprived of a significant property interest. [Citations.] The fact that the individual may later recover the property if he prevails at a post-deprivation hearing does not satisfy constitutional requirements. '[A] temporary, nonfinal deprivation of property is nonetheless a "deprivation" in the terms of the Fourteenth Amendment, and . . . must. be *preceded* by a fair hearing.' [Citation.]" (P. 458, italics added.)

Next, in *Beaudreau* we spoke of the scope and purpose of the required hearing in the following language: ". . . the taking to which a plaintiff is subjected under the above [security bond] statutes must be preceded by a hearing in the particular case in order to determine whether the statutory purpose is promoted by the imposition of the undertaking requirement. . . . [A] due process hearing would necessarily inquire into the merit of the Plaintiff's action as well as into the reasonableness of the amount of the undertaking in the light of the defendant's probable expenses." (P. 460.)

We concluded that the challenged statutes were invalid for failing to provide such a due process hearing. We emphasized that "The statutes before us make no provision for such a hearing." (P. 460.) As will be developed below, it is noteworthy that we did not attempt to "read into" the statutes a procedure for a probable cause type of hearing. Nor did we suggest that the general declaratory relief or injunction laws offered a satisfactory alternative or substitute for the probable cause hearing required by due process principles. We rejected the contention that the Supreme Court's decisions in *North Georgia* and *Mitchell* represented a significant retreat from the high court's former position. Finally, lest there be any lingering doubt, in definitive and crystal clear language, we expressed the central constitutional principle extracted from *North Georgia* which thereafter was to characterize California procedural due process requirements. Our unanimous expression, just a year ago, was that *North Georgia* ". . . *establishes that where state law authorizes one litigant to take the property of his adversary, the due process clause of the United States Constitution at the least requires judicial participation in the initial taking decision and 'an early hearing' at which the party imposing the taking demonstrates probable cause to justify it.*" (P. 465, italics added.) Our *Beaudreau* language was plain, simple, and unambiguous, and I believe I am not alone in my interpretation of the foregoing

language. (See Comment, 89 Harv.L.Rev. 1006, 1015-1016; Comment, 21 Villanova L.Rev. 282.)

Do the California statutory provisions for mechanics' liens and private stop notices meet the *North Georgia* and *Beaudreau* standards of (a) judicial participation in the taking, and (b) an early probable cause hearing? Clearly not. These laws not only fail to meet both requirements, they, in fact, fail to meet either. It is abundantly clear that a mechanics' lien may be perfected and a private stop notice filed without judicial approval or review of any kind, shape or form. The statutes are absolutely silent on the point. The protection of judicial intervention is not contemplated, required, or allowed. Furthermore, no provision is made for an *early* hearing at which the debtor may obtain release of the lien on his real property or stop notice upon his construction loan in the event of the failure of the creditor to establish probable cause to support his claim. Rather, the creditor has 90 days from recording the claim of lien to institute his suit to foreclose the mechanics' lien. (Civ. Code, § 3144.) He also has 90 days following expiration of the lien-recording period within which to file suit to enforce his stop notice claim. (*Id.,* § 3172.) As in *North Georgia,* the only method discernible on the face of the California statute by which release of either a mechanics' lien or private stop notice may be obtained is by the filing of a surety bond. (*Id.,* §§ 3143, 3171.)

Thus, the present California creditor's procedures violate each of the essential principles enunciated in *North Georgia* and reaffirmed by us last year in *Beaudreau.* The procedural pattern for enforcement of the creditor's remedies under both Georgia and California statutes is so very similar as to make both persuasive and controlling the Supreme Court's language in *North Georgia.* Further, I find it impossible to square the majority reasoning with the express and detailed imperatives of *Beaudreau.* This discord between the theme expressed by the majority and the clear lessons of *North Georgia* and *Beaudreau* arises, I suggest, from the majority's failure to accept the principle that the demands of procedural due process are so fundamental as to transcend variances in kinds of properties and types of creditors or debtors.

While not conceding this lack of harmony, the majority, conducting a search for procedural alternatives, attempt to salvage the California statutes by noting the availability of relief under California's general injunctive or declaratory relief laws, arguing that resort to them will

afford the debtor a substitute right which is the equivalent of the early hearing mandated by *North Georgia.* This argument must fail for at least two reasons. It runs afoul of a clearly expressed legislative intent and, assuming general injunctive or declaratory relief is available, such relief would be inadequate under *North Georgia.*

As previously indicated both the mechanics' lien and private stop notice laws on their face disclose an intent to preclude an early post-taking hearing on the merits of the creditor's claim. On the contrary, the legislation clearly contemplates a *summary* remedy in which the debtor's property interest is taken, followed by the initiation and prosecution within 90 days of a lawsuit by the creditor to enforce the lien or stop notice claim; only by posting a bond can the debtor achieve an early release of the lien or stop notice. As noted, the legislation nowhere provides for any probable cause type of hearing.

The foregoing procedure in the area of *private* construction contrasts sharply with the summary hearing proceedings available for the enforcement in the *public* works area of claims on which a *stop notice* is based. (Civ. Code, §§ 3197-3205.) In the public works sector the claimant, the contractor, and the public entity, may avail themselves of a special early hearing procedure to resolve any conflicts and to determine the propriety of the stop notice. This mandatory hearing is built into the statutes and, in anticipation of *North Georgia* and *Beaudreau,* it is a *court* hearing which must occur within 15 days of demand. This latter statutory procedure would, of course, be at least partially superfluous if, as the majority now contend, such a hearing is available in any event in both private and public sectors through the procedural injection of general injunctive and declaratory relief actions. Thus, the majority thesis contains an inherent internal inconsistency, and violates sound principles of statutory construction. It seems apparent to me that the statutory pattern created by these two creditor's remedies discloses a legislative intent to differentiate between private and public construction, making available as to stop notices only in the latter those special due process protections afforded by section 3197 et seq. As the general mechanics' lien laws and stop notice provisions do not apply to public works (Civ. Code, §§ 3109, 3156) so the special judicial hearing protection afforded by Civil Code section 3179 does not apply to private construction.

Nor is the foregoing effect altered in any way by the 20-day advance notice requirement for mechanics' liens (Civ. Code, §§ 3097-3114). The

notice simply alerts the debtor that the axe is to fall. It neither stays the axe nor provides a statutory means of doing so. It constitutes neither judicial intervention nor hearing.

The majority urge application of a rule that courts "must construe legislation to uphold its validity," citing *Braxton v. Municipal Court* (1973) 10 Cal.3d 138, 145 [109 Cal.Rptr. 897, 514 P.2d 697], and *In re Kay* (1970) 1 Cal.3d 930, 942 [83 Cal.Rptr. 686, 464 P.2d 142]. This interpretive rule, however, is subject to important qualifications. Both *Braxton* and *Kay* recognize that our construction of legislation must be "consistent with the statutory language and purpose" (*Kay*, at p. 942) and be otherwise "fair and reasonable" (*Braxton,* at p. 145). In other words, we cannot, in the course of attempting to uphold a statute, adopt a construction which is at odds with the Legislature's probable intent. For the reasons above expressed, it seems evident that the Legislature in its wisdom did not intend to afford debtors on private construction projects that prompt hearing expressly afforded to debtors who suffer a stop notice in the public sector.

Indeed, it is highly significant that while the majority argue that procedural due process requirements are met because a private debtor may obtain a prompt post-taking hearing by means of the general provisions governing injunctions and declaratory relief, they cite no controlling or persuasive precedent which so holds. The two authorities cited by the majority (*People v. Paramount Citrus Assn.* (1957) 147 Cal.App.2d 399, 413 [305 P.2d 135]; 2 Witkin, Cal. Procedure (2d ed. 1970) pp. 1515-1516) discuss only the general power of courts to issue mandatory or prohibitory injunctions. They do not pertain at all to the critical question whether such independent relief if sought and obtained constitutes a sufficient substitute for procedural due process. In fact, the court in *Paramount* (in construing Agr. Code provisions for enforcement of marketing orders) expressed the familiar reasoning that "If it had been the legislative intent to empower a court to make an order which in effect compels specific performance of the obligations imposed by a marketing order, *the Legislature would have, by apt language, expressly conferred that power.*" (P. 412, italics added.) Similarly, it may be said that had the Legislature in the matter before us intended to provide for a prompt post-taking hearing comparable to the procedure which it had provided for stop notices in the public area, it would, and easily could, have expressly done so, and treated both private and public sectors alike.

Further, in my view, it is not without meaning that in *North Georgia* the Supreme Court emphasized the absence of any *express* hearing provision in Georgia's garnishment laws (419 U.S. 601 at pp. 606-607 [42 L.Ed.2d 751 at pp. 756-758]) without suggesting in any manner that Georgia's *general* injunctive or declaratory relief laws might cure the glaring constitutional defects. Similarly in *Beaudreau,* we noted that "the statutory schemes" reviewed by the Supreme Court in *Arnett* v. *Kennedy* (1974) 416 U.S. 134, 145 [40 L.Ed.2d 15, 28, 94 S.Ct. 1633], and *Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. 600 at page 610 [40 L.Ed.2d 406 at page 415], provided for hearings. In contrast, the provisions of Government Code sections 947 and 951, before us in *Beaudreau* did not so provide. Significantly, we did not attempt to support the offending statute by resort to the general injunctive or declaratory relief laws to which the majority now tenaciously cling.

Even, however, were we to assume that general injunctive or declaratory relief laws furnished the debtor with an alternative to an express hearing, these remedies would be wholly inadequate substitutes for the unqualified right to an early hearing guaranteed by due process principles. First, in order to obtain any immediate relief under these general laws, the debtor is required to hire an attorney, prepare, file and serve a civil complaint, issue and serve summons, obtain and post an injunction bond (Code Civ. Proc., § 529) and cause to be issued and served the requisite restraining order or order to show cause, the latter procedures substantially equivalent to the release-of-garnishment condemned in *North Georgia.* In addition to his attorney's fees the debtor must pay the filing fees and the premium for the bond. As indicated above, in *Beaudreau* we invalidated a like bond requirement on the basis that it constituted a taking of property without a prompt post-taking hearing. Second, as we recently observed in *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d 146, 156, involving a garageman's lien, the availability of precisely the same injunctive or declaratory relief to discharge a possessory lien was held by us to be an inadequate remedy in view of the lack of assurance that a speedy hearing will in fact take place. We used the following significant language in *Adams,* "California law does not provide for accelerated hearing of contested lien claims, and only by resort to temporary restraining orders and injunctions could sale and transfer [of the automobile] be halted pending adjudication, at least if events take their ordinary course. Since temporary injunction is an extraordinary remedy and is thus discretionary [citation], *it lacks the certainty necessary to insure a hearing prior to permanent deprivation.*"

(P. 156, italics added.) Although, theoretically, no "permanent deprivation" of the property owner's interests can occur until the mechanic's lienholder proves his claim (*ante*, p. 822), the consequences of exercise of the creditor's remedy from a due process standpoint are serious, property is taken, and in terms of its effect on the debtor the lien in the words of the majority "may severely hamper his ability to sell or encumber that property" (*ante*, p. 812). As to the stop notice even a slight delay in releasing frozen construction funds can destroy the project and result in the debtor's loss of his property (*ante*, p. 813).

The severe and adverse consequences of the challenged laws upon debtors, and the lack of adequate procedural safeguards have not gone unnoticed by the academic commentators. Two recent analyses, measuring the questioned procedures against current constitutional imperatives, have concluded that mechanics' lien laws generally (Comment, *The Constitutional Validity of Mechanics' Liens Under the Due Process Clause—A Reexamination after Mitchell and North Georgia* (1975) 55 B.U.L.Rev. 263, 286-287) and California's private stop notice law in particular (Note, *California's Private Stop Notice Law: Due Process Requirements* (1974) 25 Hastings L.J. 1043, 1073, 1074) fail to pass due process scrutiny and are, accordingly, unconstitutional.

In determining whether the mechanics' lien and private stop notice remedies can survive constitutional attack, the majority stress that we are to identify, balance, and accommodate the competing interests, the purpose of which, as the majority envision it, as to mechanics' liens, is to determine whether the result represents "a significant deprivation."

It is difficult to determine precisely how the majority conceive or characterize the effect on the debtor of the creditor's remedy. They reject the thought that the effect on the debtor is "de minimis" (*ante*, pp. 812, 813), and are forced to acknowledge that as to the lien, "it may severely hamper his ability to sell or encumber that property," and that as to the stop notice the debtor "may be forced into default" and "consequently lose his property" (*ante*, p. 813), thereby resulting in the taking of a "significant property interest" (*ante*, p. 814). Nonetheless, this *significant* taking when weighed in the hands of the majority is determined by them to be "of relatively minor effect" since the mechanics' lien denies neither possession nor use to the debtor, and the stop notice "attaches only to a limited line of credit." Thus, while the majority's precise placement of the debtor's property interests is uncertain, it may be fixed roughly, by a

process of semantic triangulation, past "de minimus," and at once—"significant" and "relatively minor."

With all due deference, I suggest there is an aura of complete unreality about the suggestion that imposition on a debtor's property of a mechanics' lien, or the placing of a stop notice on his construction loan, has a "relatively minor" effect. Quite to the contrary, a mechanics' lien most certainly intrudes, and in a *major* way, upon his incidents of ownership. Following imposition of the mechanics' lien, the debtor may enjoy his fireplace but he may not sell his home. He may tend his garden, but he may not borrow on his property. His title is clouded and although his occupancy is permitted, two very fundamental rights of sale at full cash value and hypothecation are instantly impaired and restricted. As the majority concede, imposition of the mechanics' lien "may severely hamper his ability to sell or encumber" his residence. (*Ante*, p. 812.) To the average debtor whose home is usually his principal asset, this constitutes no small cloud on his financial horizon but a serious and real impairment to him, his family and his life savings. There is nothing "minor" about its impact. Exercise by the creditor of the mechanics' lien remedy poses a threat pointed directly at the vitals of the debtor's economic independence. This is not imaginary but real and its effect is immediate.

The same may be said of a stop notice. The debtor, be he homeowner or owner of a business, having negotiated a construction or home improvement loan may, upon the creditor's exercise of the stop notice remedy, frequently, if not usually, find himself in midconstruction with work halted, his property encumbered with debt and an uncompleted building or residence. The attendant delay, expense, and uncertainty are by no means minimal. They are equally threatening. The majority concede as much by acknowledging that the filing of a stop notice is a "form of garnishment, a form of seizure that *Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, 552 held a 'taking' of property." (*Ante,* p. 813.) As the majority concede, the debtor "may be forced into default on the loan, and consequently lose his property." (*Ante,* p. 813.) This is not "minor." These important effects occur not alone in a commercial setting. Their weight falls most heavily on the small homeowner and the import of the creditor's action upon him far from being minimal is very serious indeed.

The majority place principal emphasis on the claim that in the case of a mechanics' lien or materialman's lien, the laborer and materialman

have acquired an "interest" in the property since their work and materials have enhanced the value of that property. Moreover, the majority contend, in the case of the private stop notice, that although the laborer or materialman has not directly enhanced the value of the loan fund, nevertheless by enhancing the value of the realty, they have increased the value of the security of the loan fund. These considerations, it is urged, justify enfolding laborers and materialmen within a "protective policy" which gives them a more preferred status in the constitutional debate. The argument, reduced to its essentials, is that the more direct and valuable the creditor's contribution to the property, the more elevated his constitutional position and the lesser the degree of the procedural due process afforded the debtor. Through this reasoning the judicial scales become, conceptually, a constitutional "teeter totter," by which the higher the creditor is lifted at his end of the legal seesaw, the lower becomes the due process protections extended to the debtor. I cannot agree.

Preliminarily, it may be noted the majority's principal thesis, that the laborer or materialman has "acquired an interest" in the property by enhancing its value, assumes a fact which is "not in evidence." On close examination it will be seen that the majority decide, *ipse dixit,* the very issue which the due process hearing is intended to resolve. In almost all disputes of this nature, the creditor alleges improvement of the property and the debtor alleges that the creditor has failed to perform in a satisfactory manner the work contracted for; thus, the dispute, and the necessity for the hearing, the precise purpose of which is to decide whether or not, and to what extent, the value of the property really has been enhanced. Yet the majority assume the conclusion that there has been an enhancement, thereby depriving the debtor through a prompt, post-taking hearing, constitutionally required, of the opportunity of showing that no improvement has occurred or that if it does it is of substantially lessened value. Thus the hearing required to establish the nature, if any, of the benefit, enhancement, or improvement is circumvented because the creditor has "improved" the property. In short, the principal reliance of the majority is based upon a factual premise which cannot be established without the very hearing, which the majority flatly deny to the debtor-owner. Thus a conclusive presumption of improvement is created thereby obviating a hearing. I respectfully suggest that such an effect is unconstitutional and the reasoning by which it is reached is circular and illogical.

Moreover, it is evident that the laborer's or materialman's "interest" in the subject property does not justify dispensing with the debtor's due process protection of (1) prior judicial participation and (2) early post-taking hearing. In *Mitchell* v. *W. T. Grant Co., supra,* 416 U.S. 600, the claimant-vendor likewise had an interest in the lien property vis-a-vis the buyer. As the Supreme Court noted in *Mitchell,* "The reality is that both seller and buyer had current, real interests in the property . . . ." (P. 604 [40 L.Ed.2d pp. 411-412].) Yet, in accommodating those interests, the Supreme Court in *Mitchell* upheld the challenged sequestration law only because that law provided, first, for judicial participation in the issuance of the writ, and second, for an immediate post-seizure hearing on the merits of the claim. Surely a laborer's or materialman's interest in the liened property entitles him to no greater preference or protection than that accorded the vendor-owner claimant in *Mitchell.*

The majority rely upon *Beaudreau* v. *Superior Court, supra,* 14 Cal.3d 448, for their major premise that, when competing interests of creditor and debtor are involved, resolution of the due process issue requires an accommodation of those interests. As an abstract proposition, we generally weigh the competing interests of the parties in determining which should prevail. In the context of due process, however, *Beaudreau* expressly recognizes that the due process clause ". . . *at the least* requires judicial participation in the initial taking decision and 'an early hearing' at which the party imposing the taking demonstrates probable cause to justify it." (P. 465, italics added.) Under the constitutional limits as defined in *Beaudreau, Mitchell* and *North Georgia,* these fundamental minimum due process protections cannot be "balanced" out of existence in attempting to "accommodate" the respective interests of the parties. In this sense, the fundamental elements of procedural due process are *not* negotiable for the critical elements of a significant taking of property are present.

The majority rely upon *Adams* v. *Department of Motor Vehicles, supra,* 11 Cal.3d 146, for the general proposition that the propriety of weighing the competing interests of debtor and creditor must be recognized in resolving due process questions. It is significant, however, that as explained in *Adams* since the garageman-creditor in that case had already obtained the *right to possession* of the automobile when he asserted his lien, and no further assistance from state officials was required to retain possession of the vehicle, it would constitute a violation of *the garageman's* due process rights to deprive him of his

possessory lien. (Pp. 154-155.) The challenged mechanics', lien and stop notice laws before us do not, of course, involve such possessory liens.

It is contended that a ". . . state policy strongly supports the preservation of laws which give the laborer and materialman security for their claims." (*Ante,* at p. 827.) They then consider the "social effect" of the liens measured against the detriment occasioned to the debtor, determine that "[t]he balance tips in favor of the worker and material-man," and hold that, accordingly, the "safeguards" afforded the debtor meet due process demands. (*Ante,* at pp. 827, 828.)

I find no support whatever in *North Georgia* for the kind of preference that is proposed by the majority based either on the nature of the creditor's claim or the character of the property affected or any "social effect" thereby occasioned. Indeed, a similar argument was made, and flatly rejected, in *North Georgia* itself. There, respondent argued for similar preferential treatment urging that a different standard should be employed in measuring the validity of laws directed against corporate bank accounts as compared with those affecting householders and other "victims of contracts of adhesion." The Supreme Court rejected the proposed distinction because ". . . the probability of irreparable injury . . . is sufficiently great so that some procedures are necessary to guard against the risk of initial error. *We are no more inclined now than we have been in the past to distinguish among different kinds of property in applying the Due Process Clause.*" (419 U.S. 601, at p. 608 [42 L.Ed.2d 751, at p. 758], italics added.)

The fact that the mechanics' and materialman's lien laws are of ancient origin and acceptance makes, in my view, all the more significant the fact that, to my knowledge, not once has it been asserted, much less held until now, that artisans and materialmen held a special, favored, or preferred creditor status in a *constitutional* sense, reducing thereby to a "minimal" character the due process safeguards extended to debtors.

Beginning with *Sniadach,* the only recognized exception to the requirements of notice, hearing, and judicial interposition, has been the relatively rare instance of an "extraordinary situation requiring special protection of a state or creditor interest." No demonstrated "extraordinary situation" appears herein. As expressed in the Note, *California's Private Stop Notice Law: Due Process Requirements, supra,* 25 Hastings L.J., at page 1070, courts have recognized three kinds of extraordinary

circumstances: "[W]hen the public is in great physical or financial danger, when there is a significant risk that a criminal defendant will abscond, and when a civil defendant will escape the effects of a potential adverse judgment unless his property is seized immediately." In my view, none of these narrowly conceived exceptions applies to the mechanics' lien or stop notice situation. The well accepted principles of preference extended mechanics, artisans, and materialmen, recognized both in the Constitution and by statute, permit priorities vis-a-vis other creditors. They cannot, however, impair or dilute the fundamental procedural due process protections afforded debtors by the Fifth and Fourteenth Amendments to the federal Constitution, and article I, section 13, of the California Constitution. The debtor's property remains an appropriate target for the creditor, but it may be reached only through constitutionally permissible methods affording the debtor the twin protections of judicial intervention and early hearing.

In summary, in an important series of cases following *Sniadach* a number of creditor's remedies have been invalidated on due process grounds. The underlying reasoning of these cases is equally applicable to the California mechanics' lien and stop notice legislation which demonstrably lack those procedural safeguards required by *North Georgia* and *Beaudreau,* the most recent expressions of due process principles in this area. We ourselves have described the *Sniadach* holding as "*not* a rivulet of wage garnishment but part of the mainstream of the past procedural due process decisions of the United States Supreme Court." (*Randone* v. *Appellate Department, supra,* 5 Cal.3d 536, at p. 550, italics added.) To this I stress the importance of a metaphorical extension—this broad flood of Fourteenth Amendment protections and safeguards is diverted or broken by no islands of special privilege or immunity that rise above its constitutionally cleansing wash.

Due process principles demand even-handed, impartial, and consistent application. The constitutional sword cuts both ways. Its sweep recognizes no preferences. The wage earner under *Randone* is the beneficiary of full procedural due process protection before his wages are attached. When, however, as a creditor in turn he asserts his own lien or private stop notice claim he may not be heard to complain if similar protections are afforded to a debtor substantially affected by his claim. Both the burdens and blessings of those fundamental constitutional guarantees apply not to some but to all. They do not admit of partial application, or bending of principle. For us to conclude otherwise, it

seems to me, is to accept a form of *selective* due process which is unfair, illogical, arbitrary and dangerous.

Because they lack provision for judicial participation and an early hearing, I think the California laws concerning both mechanics' liens and private stop notices are unconstitutional in their present form and would so hold.

McComb, J., and Clark, J., concurred.

On September 29, 1976, the opinion was modified to read as printed above.